**J. Gary DiLAURA, Individually and as President of Waterfront Homeowners Association of Western New York, et al., Plaintiffs,**

v.

**POWER AUTHORITY OF the STATE OF NEW YORK, Defendant.**

No. Civ. 85–500A.

United States District Court, W.D. New York.

Dec. 2, 1991.

John Bartolomei, Buffalo, N.Y., for plaintiffs.

Andrew Feldman, Buffalo, N.Y., for defendant.

## DECISION AND ORDER

ARCARA, District Judge.

### I.

### INTRODUCTION

Plaintiffs commenced this action on April 15, 1985. The case was originally assigned to the Honorable John T. Elfvin. Plaintiffs filed an Amended Complaint on December 31, 1985. The Amended Complaint states two causes of action. The first cause of action asserts a claim under 16 U.S.C. § 803(c).[1] The second cause of action asserts a state law negligence claim. Plaintiffs seek both compensatory and punitive damages, as well as an injunction enjoining the Power Authority of the State of New York ("PASNY") from future operation of its power plant in such a manner as to cause serious damage to their property.

Plaintiffs moved for a preliminary injunction on December 31, 1985. In a Memorandum and Order dated February 26, 1987, Judge Elfvin denied the motion. 654 F.Supp. 641 (W.D.N.Y.1987). The case was transferred to this Court on April 19, 1989. The trial was scheduled to begin May 1, 1991. However, during a final pretrial conference, the Court raised *sua sponte* the issue of subject matter jurisdiction. The parties were given an opportunity to brief and argue their respective positions.

After reviewing the submissions of the parties and hearing argument from counsel, the Court finds that plaintiffs' first cause of action under 16 U.S.C. § 803(c) fails to state a claim upon which relief can be granted and must therefore must be dismissed. Further, the Court finds that it lacks subject matter jurisdiction over plaintiffs' request for injunctive relief. Finally, the Court declines to exercise pendent jurisdiction over plaintiffs' state law negligence claim.

### II.

### BACKGROUND

The Niagara River is actually a strait that connects Lakes Erie and Ontario. It flows from south to north with the United States on the east bank and Canada on the west bank. At one point, a large island known as Grand Island, causes the River to divide into two channels. The East Channel flows between Grand Island and the United States, while the West Channel flows between Grand Island and Canada. The East and West Channels then join together again before the water flows over Niagara Falls. The portion of the River upstream from the Falls is commonly referred to as the Upper Niagara River. *See* Map attached as an Appendix A of this Decision.

Plaintiffs are riparian property owners in the State of New York located along the East Channel of the Niagara River. PASNY is a corporate municipal instrumentality and political subdivision of the State of New York, operating pursuant to Article 5, Title 1 of the New York State Public Authorities Law for the purpose of generating, selling and transmitting electric power and energy. PASNY is licensed by the federal government pursuant to the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, and currently operates a power plant utilizing the waters of the Niagara River. This power plant is known as the Niagara Project.

---

1. 16 U.S.C. § 803(c) provides in pertinent part:
   Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.

This case has a lengthy background. On January 11, 1909, the United States and Canada signed the Boundary Waters Treaty of 1909 ("1909 Treaty"). 36 Stat. 2448 (1909); T.S. No. 548. The purposes of the 1909 Treaty were: (1) to provide guidance for the use of boundary waters; and (2) to provide a forum for resolving questions that might arise regarding the use of such waters. *See Miller v. United States,* 583 F.2d 857, 860 (6th Cir.1978); *Soucheray v. United States Army Corps of Eng'rs.,* 483 F.Supp. 352, 353 (W.D.Wis.1979). The 1909 Treaty established an International Joint Commission ("IJC"), comprised of three members from each country, to approve and regulate the diversion, obstruction and use of boundary waters. The 1909 Treaty also regulated the use of Niagara River water by establishing minimum flows of water over Niagara Falls.

After the 1909 Treaty went into effect, there was interest in diversion of additional water from the Niagara River for power production. A Special International Niagara Board was established to study additional power development. *See* S.Doc. No. 128, 71st Cong., 2d Sess. (1929). The Board submitted a report to the United States and Canada in 1929. *Id.*

In 1950, the United States and Canada concluded the Treaty Concerning Uses of the Waters of the Niagara River ("1950 Treaty"). TIAS 2130. The 1950 Treaty provided for the completion of remedial works in the Niagara River above Niagara Falls necessary to carry out the objectives envisaged in the Special International Niagara Board's 1929 report. *See* Art. II of the 1950 Treaty. The 1950 Treaty also superseded the limitation in the 1909 Treaty on diversion of water from the Niagara River and authorized a substantial increase in the amount of water that could be diverted for power production. *See* Art. III, IV and V of the 1950 Treaty.

Following ratification of the 1950 Treaty, the Canadians promptly proceeded to construct additional hydroelectric facilities on their side of the River to take advantage of the increased diversions authorized under the 1950 Treaty. In 1953, the United States and Canadian governments approved IJC recommendations concerning design and construction of the remedial works. In August, 1953, the IJC established the International Niagara Board of Control ("Niagara Board") to supervise the construction and operation of the remedial works.

The purpose of the remedial works is to regulate the flow of water over the Falls and permit increased diversions of water for power production without affecting the water levels that previously existed in the Upper Niagara River. The remedial works include: the Chippawa–Grass Island Pool Control Structure ("Control Structure"); several excavations in the bed of the River at the Canadian Falls; excavation of the Tower Island shoal near the Control Structure; and excavation of the ice escape channel between the power intakes on the American side and the Tower Island area. *See* Map attached at Appendix B of this Decision.

The principal remedial work is the Control Structure. The Control Structure contains eighteen gates and extends approximately three-fifths of the way across the River from the Canadian shore, about 5,000 feet upstream from the crest of the Canadian Falls. It forms a pool in the River, known as the Grass Island Pool, that extends from the Control Structure upstream in both the East and West Channels of the River. The Control Structure permits regulation of the flow of water over the Falls to meet the specific flow requirements of the 1950 Treaty, and regulation of the water level in the Grass Island Pool.

As previously stated, one of the goals of the Control Structure and the other remedial works was to permit the additional diversion of water for power production and regulation of the flow over the Falls without affecting the relationship between the total river flow and the water levels in the Grass Island Pool. In order to achieve this goal, the Niagara Board issued a Directive in 1955 concerning the maintenance of water levels in the Grass Island Pool and operation of the Control Structure. In 1973, the Niagara Board issued a revised

Directive regulating the water levels in the Grass Island Pool. Both Directives dealt in part with the subject of ice conditions.

In 1957, Congress enacted the Niagara Redevelopment Act ("NRA"), 16 U.S.C. § 836 *et seq.* The NRA directed the Federal Power Commission ("FPC"), succeeded in 1977 by the Federal Energy Regulatory Commission ("FERC"), to issue a license to PASNY "for construction and operation of a power project with capacity to utilize all of the United States' share of the water of the Niagara River permitted to be used by international agreement." NRA, 71 Stat. 401, 16 U.S.C. § 836(a). The FPC issued a license for the Niagara Project to PASNY in January, 1958. 19 F.P.C. 186.

The license expressly authorizes PASNY to divert from the Niagara River all of the United States' share of waters permitted to be used by international agreement. Further, as required by 16 U.S.C. § 803(c), the license specifically reserves to FERC the right to regulate PASNY's use of the Niagara River waters for the protection of life, health and property. The Niagara Project began operation in 1961.

Compliance with the 1950 Treaty flow requirements is achieved by operation of the Control Structure and by diversions of water to the United States and Canadian hydroelectric plants. *See* Item 19, Hollmer Affidavit ¶ 10. Diversions of water for power production to the Niagara Project and at two of the four locations on the Canadian side of the River are made from the Grass Island Pool. More specifically, the Control Structure diverts water from the Grass Island Pool into the intakes of the power plants on each side of the River. The diverted water is then used for power production before being returned to the River downstream. The gates of the Control Structure can be manipulated so as to regulate the amount of water that is diverted for power production. *Id.* at ¶ 11. This regulatory process requires close coordination between PASNY and its Canadian counterpart, Ontario Hydro. *Id.* at ¶ 13. In particular, all decisions regarding diversions of water from the River for power production, operation of the Control Struc-

ture, and ice control operations are made on a consultative and coordinated basis by the two power entities. *Id.*

Ice conditions on the Niagara River can significantly affect the flow of the River and the operation of the Control Structure. *Id.* at ¶ 14. Consequently, PASNY and Ontario Hydro have jointly developed procedures for minimizing the effect of ice on the flow of the River and the operation of the Control Structure. These procedures include, *inter alia,* installation of an ice boom in Lake Erie at the entrance of the Niagara River, operation of two ice-breaking vessels in the Grass Island Pool and procedures for monitoring ice conditions. *Id.* The procedures are described in the *Niagara River Ice Control Manual* that has been prepared jointly by PASNY and Ontario Hydro. *See* Item 12, Copy of *Niagara River Ice Control Manual* attached at Plaintiff's Motion for Preliminary Injunction.

The instant action arises out of severe weather and ice conditions on the Upper Niagara River in January and February 1985. Plaintiffs allege that during this period, PASNY caused, through its operation of the Niagara Project, an ice jam that in turn caused flooding and ice damage to their property. More specifically, plaintiffs allege that during the severe weather, PASNY negligently diverted an excessive quantity of water into its power intakes thus causing the River to flow in a reverse direction in the East Channel, and that this reverse flow, in turn, caused flooding and ice damage.

## III.

### DISCUSSION

■ " 'Federal subject matter jurisdiction may be raised at any time during litigation and must be raised *sua sponte* by a federal court when there is an indication that jurisdiction is lacking.' " *Alumax Mill Prods., Inc. v. Congress Fin. Corp.,* 912 F.2d 996, 1002 (8th Cir.1990) (quoting *Hughes v. Patrolmen's Benevolent Ass'n of City of New York, Inc.,* 850 F.2d 876, 881 (2d Cir.), *cert. denied,* 488 U.S. 967, 109

S.Ct. 495, 102 L.Ed.2d 532 (1988)). Federal courts, unlike state courts, are courts of limited, not general, jurisdiction. *Id.*

As stated earlier, plaintiffs' Amended Complaint asserts two causes of action. The first asserts a claim under 16 U.S.C. § 803(c). The second asserts a state law negligence claim. Plaintiffs argue that § 803(c) creates a private federal cause of action and, therefore, the Court has subject matter jurisdiction over the first cause of action under 16 U.S.C. § 825p.[2] With regard to the state law negligence claim, plaintiffs argue that the Court has pendent jurisdiction. PASNY, on the other hand, argues that § 803(c) does not create a private federal cause of action and, therefore, the Court lacks subject matter jurisdiction over plaintiffs' first cause of action. Further, PASNY argues that, even if § 803(c) creates a private cause of action for money damages, the Court still lacks subject matter jurisdiction to grant injunctive relief because the use and diversion of water from the Niagara River are subject to international treaties and are under the jurisdiction of the IJC and FERC. PASNY agrees with plaintiffs, however, that the Court should exercise pendent jurisdiction over plaintiffs' state law negligence claim even if the § 803(c) claim is dismissed.

### A.

### THE § 803(c) CLAIM

■ When determining whether a federal statute provides a private litigant a cause of action, " '[t]he ultimate issue is whether Congress intended to create a private cause of action.' " *Karahalios v. Nat'l Fed'n of Fed. Employees*, 489 U.S. 527, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989) (quoting *California v. Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981)). "Unless such 'congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate of implication of a private remedy simply does not exist.' " *Id.* (quoting *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988)).

■ In determining whether Congress intended to create a private cause of action under a federal statute, the Second Circuit applies the four-part test established by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *See, e.g., Reeves v. Continental Equities Corp. of Am.*, 912 F.2d 37, 40 (2d Cir.1990). The *Cort v. Ash* test considers:

First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted,—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law.

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). After applying the *Cort v. Ash* test in this case, the Court finds that Congress did not intend to create a new private federal cause of action under § 803(c). Instead, Congress only intended to preserve the rights of injured riparian property owners to seek relief against licensees in state court under state tort law.

### 1. *Benefited Class*

■ Section 803, entitled "Conditions of license generally," lists nine conditions with which licensees must comply. Section 803(c) provides that, as one of the conditions of a license, it is the licensee and not the United States that is liable for damages occasioned to the property of others by the construction, operation or maintenance of project works. Thus, § 803(c), as it relates

---

**2.** 16 U.S.C. § 825p provides in pertinent part: The District Courts of the United States ... shall have exclusive jurisdiction of all suits in equity, and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, [the FPA].

to liability for damages, was enacted to benefit the United States by exculpating it from liability for any damages caused by its licensees. It was not intended to create a new federal cause of action for injured riparian property owners.

Plaintiffs argue that this interpretation of the statute does not make sense since the United States was already protected from suit under the doctrine of sovereign immunity. There are a number of reasons, however, why Congress might have deemed it prudent to add this exculpatory language. First, Congress may have wanted to make it clear that the United States was not waiving its sovereign immunity. Second, Congress may have wanted to make it clear that licensees do not acquire sovereign immunity merely because they are licensed by the United States. Finally, Congress may have wanted to make it clear that the United States would not be liable under the Fifth Amendment for acts committed by licensees. For example, if a riparian property owner's land is permanently flooded due to the construction, operation or maintenance of a licensee's project works, § 803(c) makes clear that it is the licensee, not the United States, who must pay the owner just compensation for the taking of his or her property.

### 2. Legislative Intent

■ Where, as here, the resolution of an issue turns on the construction of a federal statute and the intention of Congress, the Court must "look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). While the language of § 803(c) makes it clear that the FPA does not shield licensees from liability for damages occasioned by the construction, maintenance or operation of project works, the statute does not, on its face, resolve the question of whether the liability of licensees is to be determined according to state law or a new federal tort law. *See South Carolina Pub. Serv. Auth. v. FERC*, 850 F.2d 788, 794 (D.C.Cir. 1988). Nor does it specify whether an injured property owner may bring suit against a licensee in federal court. Thus, since the language of the statute is unclear, the Court must turn to the legislative history of § 803(c) in order to determine Congress' intent.

As the Supreme Court has noted, the legislative history of the FPA "discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the Nation and a determination to avoid unconstitutional invasion of the jurisdiction of the States." *First Iowa Hydro–Elec. Coop. v. FPC*, 328 U.S. 152, 171, 66 S.Ct. 906, 915, 90 L.Ed. 1143 (1946); *see id.* at 174, 66 S.Ct. at 916 (quoting remarks of Rep. William L. LaFollette, 56 Cong.Rec. 9810: "We are earnestly trying not to infringe the rights of the States.").[3]

Congress' determination to avoid invasion of the jurisdiction of the States is reflected in the legislative history of § 803(c). *See South Carolina Pub. Serv. Auth.*, 850 F.2d at 794–95 (provides summary of legislative history of § 803(c)). The original version of § 803(c), reported to the House of Representatives by the Committee on Water Power, provided in pertinent part:

> No license hereunder shall have the effect of relieving the licensee from liability for any injury or damages occasioned by the construction, maintenance, or operation of said project works; and the United States shall in no event be liable therefor.

H.R.Rep. No. 715, 65th Cong., 2d Sess. (1918). During the floor debate in the

---

**3.** The Senate Committee on Commerce also noted, in reference to an early draft of the FPA, that:

> [T]he committee is of the opinion that the bill is so framed as to protect and maintain the constitutional power and control of the Federal Government over navigable streams, as well as the sovereignty of the States and the rights of riparian proprietors over and in the beds and waters of those streams, and allow the full exercise and enjoyment of the latter, subject to the paramount authority of the Congress to regulate the same for navigation purposes.

S.Rep. No. 179, 65th Cong., 2d Sess. 4 (1917).

House, Representative Graham of Illinois proposed that § 803 be amended to require licensees to make advance payment or settlement of damages prior to construction according to the laws of the state where the project was to be built. 56 Cong.Rec. 9913–14 (1918). While Representative Dempsey objected to the amendment on the ground that it would be impracticable to make licensees settle "in advance before they can know the amount of the settlement," no one challenged the premise that damages should be determined according to state law. *See id.* Thus, both the original version of the statute and the Graham amendment, which was accepted, clearly demonstrate that it was Congress' intent to preserve any existing cause of action for damages under state law.

While the original version of the statute and the Graham amendment were later superseded, in conference with the Senate, by the current language of § 803(c), the Conference Report, H.R.Rep. No. 1147, 65th Cong., 3d Sess. 16 (1919), does not indicate any intention to abandon the principle that property damages caused by licensees should be determined according to state law. Thus, the Court finds that the intent of Congress, as readily demonstrated through the words spoken by its members during the course of debate on § 803(c), was that any liability for damages resulting from the construction, maintenance or operation of power works would be borne by the licensees and that the substantive law to be applied in determining liability for, and the amount of, damages would be state tort law. Most courts that have considered the meaning of § 803(c) have similarly concluded that Congress intended simply to preserve any existing cause of action under state law. *See, e.g., South Carolina Pub. Serv. Auth.,* 850 F.2d at 794–95; *Pike Rapids Power Co. v. Minneapolis, St. P. & S.S.M.R. Co.,* 99 F.2d 902, 911–12 (8th Cir.1938), *cert. denied,* 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939); *Beaunit Corp. v. Alabama Power Corp.,* 370 F.Supp. 1044, 1050–51 (N.D.Ala.1973); *Key Sales Co. v. South Carolina Elec. & Gas Co.,* 290 F.Supp. 8, 23 (D.S.C.1968), *aff'd,* 422 F.2d 389 (4th Cir.1970); *Rice Hope Plantation v. South Carolina Pub. Serv. Auth.,* 216 S.C. 500, 59 S.E.2d 132, 140–41 (1950); *Alabama Power Co. v. Smith,* 229 Ala. 105, 155 So. 601, 604 (1934); *but see Seaboard Air Line R.R. Co. v. County of Crisp,* 280 F.2d 873, 875–76 (5th Cir.1960), *cert. denied,* 364 U.S. 942, 81 S.Ct. 460, 5 L.Ed.2d 373 (1961); *DiLaura v. Power Auth. of the State of New York,* 654 F.Supp. 641, 644 (W.D.N.Y. 1987).

Assuming, as the legislative history suggests, that Congress intended for § 803(c) merely to preserve existing state laws governing damage liability of licensees, it follows that Congress intended injured riparian property owners to bring suit against licensees for damages in state, rather than federal court. As the legislative history of the FPA makes clear, Congress did not want to oust the States of their traditional authority to determine property rights and rules of liability in tort.[4] Nor did Congress intend that such authority be shared by federal and state authorities. In *First Iowa Hydro–Elec.,* the Supreme Court expressly warned against interpretations of the FPA that establish "futile duplication of two authorities over the same subject

---

**4.** During the course of House debate on the bill, in the years prior to passage of the Federal Water Power Act, Representative LaFollette of Washington, a member of the Special Committee on Water Power, stated:

The property rights are within the State. It can dispose of beds, or parts of them, regardless of the riparian ownership of the banks, if it desires to, and that has been done in some States. If we put this language, [§ 9(b) ] which is practically taken from the Supreme Court decision [*United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746], as to the property rights of the States as to the bed and

the banks and to the diversion of the water, then it is sure that we have not infringed any of the rights of the States in that respect, or any of their rules of property, and we are trying in this bill above everything else to overcome a divided authority and pass a bill that will make it possible to get development. We are earnestly trying not to infringe the rights of the States. If possible we want a bill that cannot be defeated in the Supreme Court because of omissions, because of a lack of some provision that we should have put in the bill to safeguard the States.

56 Cong.Rec. 9810 (1918).

matter." 328 U.S. at 171, 66 S.Ct. at 915. The Court stated that:

> In the [FPA] there is a separation of those subjects that remain under the jurisdiction of the States from those subjects that the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the [FPA] establishes a dual system of control. The duality of control consists merely of the division of common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. The duality does not require two agencies to share in the final decision of the same issue.

*Id.* at 167–68, 66 S.Ct. at 913.

Applying these principles to the instant case, the Court finds that Congress did not intend for the determination of when licensees would be liable to their neighbors for property damages to be made in federal court. Instead, Congress intended that such a determination would "remain under the jurisdiction of the States," and would be decided exclusively by state courts applying state tort law.[5] *See South Carolina Pub. Serv. Auth.,* 850 F.2d at 795.

### 3. *Inconsistency in Implying a Private Cause of Action*

As previously stated, the legislative history of § 803(c) clearly establishes that Congress did not intend to create a private federal cause of action. Instead, it only intended to shield the United States from liability in suits brought by parties damaged because of the construction, maintenance or operation of project works. Thus, in view of Congress' intent in enacting the statute, it would be inconsistent to find that § 803(c) creates a private federal cause of action.

### 4. *Cause of Action Traditionally Relegated to State Law*

Property rights and liability in tort have traditionally been areas of state, not federal, law. *South Carolina Pub. Serv. Auth.,* 850 F.2d at 792 n. 3 (citing *Georgia Power Co. v. Sanders,* 617 F.2d 1112 (5th Cir. 1980), *cert. denied,* 450 U.S. 936, 101 S.Ct. 1403, 67 L.Ed.2d 372 (1981) (relying, in part, on the state's strong interest in avoiding the displacement of its laws governing property rights, the court concluded that state law should be applied to determine the appropriate compensation in condemnation actions under the FPA)). Thus, it would be inappropriate to infer that § 803(c) creates new federal property rights on behalf of riparian property owners or creates new liabilities in tort on behalf of licensees.

In sum, after applying the four-part test in *Cort v. Ash,* the Court finds that it was not Congress' intent when it enacted § 803(c) to provide riparian property owners with a new federal cause of action against licensees. Instead, Congress simply wanted to preserve the right of injured property owners to bring actions for damages against licensees in state court under traditional state tort law, and to shield the United States against liability.

While the Court initially raised the issue of subject matter jurisdiction *sua sponte,* it now finds upon further reflection, that the issue is really one of failure to state a claim upon which relief can be granted.[6]

> Little is needed for a plaintiff to assert a claim sufficient to give the federal court jurisdiction. Where the complaint 'is so drawn as to seek recovery under the Constitution or law of the United States,' the district court must entertain the suit unless the federal claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or

---

**5.** Obviously, if there is diversity of citizenship between the parties, a federal court would have subject matter jurisdiction under 28 U.S.C. § 1332.

**6.** "As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action.... If the complaint raises a federal question, the mere claim confers power to decide that it has no merit, as well as to decide that it has." *Montana–Dakota Util. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951).

where such claim is wholly insubstantial and frivolous.'

*Spencer v. Casavilla,* 903 F.2d 171, 173 (2d Cir.1990) (quoting *Bell v. Hood,* 327 U.S. 678, 681, 66 S.Ct. 773, 775, 90 L.Ed. 939 (1946)).

However,

[i]f dismissal for facial insubstantiality is avoided, further inquiry into the existence of federal question jurisdiction ... turns on the existence of the underlying claim as pleaded. The existence of such a claim is of course a necessary predicate for the existence of federal jurisdiction over it. But if it is determined on this inquiry that jurisdiction fails because no such federal claim exists, the proper disposition is to dismiss on the merits for failure to state a claim rather than for a want of subject matter jurisdiction.

*Ridenour v. Andrews Fed. Credit Union,* 897 F.2d 715, 719 (4th Cir.1990) (citing *Bell,* 327 U.S. at 682, 66 S.Ct. at 776; *Mount Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 279, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)); *see also Town of W. Hartford v. Operation Rescue,* 915 F.2d 92, 99–100 (2d Cir.1990); *Spencer,* 903 F.2d at 173.

In this case, plaintiffs' § 803(c) claim is not immaterial and does not appear to have been made solely for the purpose of obtaining jurisdiction. Nor is it wholly insubstantial or frivolous. Thus, the Court has subject matter jurisdiction over the § 803(c) claim. However, since the Court finds, for the reasons stated earlier, that § 803(c) does not create a federal cause of action, plaintiffs' § 803(c) claim must be dismissed for failure to state a claim upon which relief can be granted.

While the Court is aware that Judge Elfvin previously stated in this case that § 803(c) does create a federal cause of action for monetary damages, it must be remembered that he made that determination in the context of a motion for a preliminary injunction. 654 F.Supp. at 641. Thus, the issue of whether § 803(c) creates a federal cause of action for damages was not directly before him and his holding in that regard was merely *dictum.* Further, Judge Elfvin did not have the benefit, at that time, of Judge Ginsberg's decision in *South Carolina Public Service Authority v. FERC.*

### B.

### PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF

Even if the Court were to determine that § 803(c) creates a cause of action for monetary damages, it would still lack jurisdiction over plaintiffs' request for injunctive relief pursuant to the "political question" doctrine. The classic, oft-quoted statement of the "political question" doctrine was provided by the Supreme Court in *Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962). The Court stated:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it; or the impossibility if deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710. The injunctive relief sought by plaintiffs in this case raises complex technical issues concerning the use of the Niagara River for power production purposes by two sovereign nations, the United States and Canada. These issues have been specifically assigned by the United States government either to the jurisdiction of the IJC by virtue of the Treaties of 1909 and 1950, or to the jurisdiction of FERC under the FPA. Given the administrative review provided by both the IJC and FERC, and the availability of federal judicial review of FERC decisions in the United States Court of Appeals, there is no basis for plaintiffs' request to have this Court

involve itself in the regulation of the Niagara River.

### 1. *International Joint Commission*

■ The IJC was established to regulate the uses and diversions of boundary waters between the United States and Canada, including the waters of the Great Lakes and the Niagara River. The Treaties of 1909 and 1950 granted the IJC jurisdiction over boundary waters flowing into the Niagara River. Regulation of the Niagara River, therefore, must be accomplished through the joint action of the United States and Canada via the IJC. Neither PASNY nor Ontario Hydro can unilaterally make decisions regarding the levels and flows of the Niagara River. Federal courts have repeatedly recognized the IJC's authority over United States–Canadian boundary waters. *See, e.g., Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297, 300 (Fed.Cir.1987) ("[T]he United States agreed in the Boundary Waters Treaty that the IJC, not the United States, would have the final say over the use of boundary waters...."); *Miller*, 583 F.2d at 860 ("[The IJC] has the authority to approve or prohibit and to regulate the obstruction or diversion of certain waters, and the United States and Canada agree not to allow construction of such projects without IJC approval."); *Soucheray*, 483 F.Supp. at 355 ("By signing the Treaty of 1909, the United States gave up any control over the diversion, obstruction and use of boundary waters [to the IJC]."). Thus, an injunction compelling PASNY to exert unilateral control over diversions from the River would infringe the jurisdiction of the IJC as established by the 1909 Treaty.

The case of *Soucheray v. United States Army Corps of Eng'rs*, 483 F.Supp. 352 (W.D.Wis.1979) appears to be on all fours with this case. There, as here, the plaintiffs were riparian property owners who allegedly suffered flood damage from boundary waters governed by the 1909 Treaty and regulated by the IJC. Further, as here, plaintiffs sought injunctive relief against the entity they believed had some measure of control over these waters; in *Soucheray* it was the United States Army Corps of Engineers; here it is PASNY.

The federal district court in *Soucheray*, relying on the "political question" doctrine, stated that it had no basis for exercising jurisdiction over claims that were so clearly within the jurisdiction of the IJC. As the Court noted:

[Q]uestions regarding the [IJC's] regulation of the boundary waters under the Treaty of 1909 may not be appropriate for judicial resolution. These questions contain issues of foreign relations for which the Constitution gives Congress and the Executive primary responsibility. *See Miller v. United States*, 583 F.2d 857, 868 (6th Cir.1978); *Dole v. Carter*, 569 F.2d 1109, 1110 (10th Cir.1977); *Holmes v. Laird*, 148 U.S.App.D.C. 187, 191, 459 F.2d 1211, 1215 (D.C.Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Canadian Transport Co. v. United States*, 430 F.Supp. 1168, 1172 (D.D.C.1977). *See also Baker v. Carr*, 369 U.S. 186, 210–17, 82 S.Ct. 691, 706–10, 7 L.Ed.2d 663 (1962).

\*     \*     \*     \*     \*     \*

If this Court were to order defendants to change the manner in which they regulate Lake Superior, the effect would be felt not only on the American shore, but also on the Canadian side, and on the lower Great Lakes. The potential for conflict and multiple decisions is obvious.... [O]wners of shoreline property on the lower lakes would undoubtedly be upset by the higher levels that would result by increased Superior discharge. If they went into American or Canadian courts seeking injunctive relief, a truly confusing situation would result. It is clearly preferable to leave resolution of this problem with the [IJC], where the Treaty of 1909 places it.

*Id.* at 356.

■ While *Soucheray* is not binding precedent on this Court, the Court finds it persuasive. Because decisions concerning the regulation of the flow of the Niagara River affect both the United States and Canadian shorelines, it only makes sense that such decisions be made by a single

entity acting in the best interest of both countries. Both Congress and the Executive recognized this reality and, in the 1909 Treaty, ceded control over the United States' share of the boundary waters to the IJC. The regulation of boundary waters by court injunction would invade the IJC's jurisdiction and result in the potential for conflicting decisions by administrative agencies and courts on both sides of the United States–Canadian border. This Court should not interfere with the complicated regulatory scheme established by the Treaties of 1909 and 1950 and the governments of two separate sovereign nations. The regulation of the flow of these boundary waters is a matter of foreign relations and, therefore, falls outside the Court's subject matter jurisdiction.

■ Nor can the plaintiffs avoid the IJC's jurisdiction by invoking the Court's jurisdiction under the Treaties of 1909 and 1950. A treaty must provide expressly for a private right of action before a plaintiff can assert a claim thereunder in federal court. *Dreyfus v. Von Finck*, 534 F.2d 24, 30 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *Smith v. Canadian Pac. Airways*, 452 F.2d 798, 802 (2d Cir.1971). The 1909 Treaty does not create a private cause of action, *Miller*, 583 F.2d at 859–60, and nothing in the 1950 Treaty indicates that a different result should obtain.

In a prior decision in this case denying plaintiffs' motion for a preliminary injunction, Judge Elfvin wrestled with the issue of whether the Court has subject matter jurisdiction over plaintiffs' request for injunctive relief. He finally concluded that "although the issue of this Court's jurisdiction to issue the requested [injunctive] relief has not been satisfactorily addressed or resolved, jurisdiction is assumed for the purpose of resolving the present motion." 654 F.Supp. at 646. He then went on to deny the motion for a preliminary injunction because plaintiffs failed to establish: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) a balance of hardships tipping decidedly in their favor. It is obvious from his decision that Judge

Elfvin had serious questions concerning the Court's jurisdiction. He deemed it prudent, however, to assume jurisdiction and to decide the preliminary injunction motion on its merits. The Court cannot say that it would have done otherwise.

### 2. *Federal Energy Regulatory Commission*

■ To the extent that the United States retained any right to regulate the use and diversion of the Niagara River water, it has delegated the exercise of those rights to FERC. By virtue of the FPA, FERC is vested with the authority and responsibility for licensing hydroelectric projects for the use and benefit of interstate and foreign commerce. The FPA is a comprehensive statutory scheme endowing FERC with full regulatory authority over projects such as the Niagara Project and it is to be broadly construed. *Northern States Power Co. v. FPC*, 118 F.2d 141, 144 (7th Cir.1941). As noted in *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153 (D.C.Cir.1967), Congress, by authorizing the FPC, the predecessor of FERC, to perform any and all acts that it may find necessary or appropriate to carry out its statutory mandate, "entrusts a broad subject-matter to administration by the Commission, subject to Congressional oversight, in the light of new and evolving problems and doctrines." *Id.* at 158.

The FPA requires FERC to provide certain license conditions. Among them is a condition requiring the licensee, in operating the project, to conform to such reasonable rules and regulations as FERC may prescribe for the protection of life, health and property. 16 U.S.C. § 803(c).

It is for FERC to decide in the first instance whether the licensee is in compliance with the conditions of the license. *Cf. Allegheny Elec. Coop. Co. v. Power Auth. for State of New York*, 630 F.Supp. 1271, 1275 (S.D.N.Y.1986). Complaints to FERC may be made by any person regarding actions or omissions by a licensee and FERC may investigate in such manner and by such means as it shall find proper. 16 U.S.C. § 825e. FERC has the power to conduct investigations, hold hearings and

make rulings to require compliance by the licensee with the conditions of its license and FERC regulations. 16 U.S.C. §§ 825e–825h.

Judicial review of FERC action or inaction is strictly circumscribed by the FPA. 16 U.S.C. § 825i. First the complainant must appeal the FERC action to the full Commission. 18 C.F.R. § 385.901 *et seq.* Then the complainant must request a rehearing. *Id.* at § 385.713. Only then, after exhausting all administrative remedies, can the complainant seek judicial review. Even then, however, judicial review can be sought only in the United States Court of Appeals, not in District Court. 16 U.S.C. § 825*l.*

The case of *Halifax County v. Lever,* 718 F.2d 649 (4th Cir.1983), is instructive on this appeal procedure. In *Halifax,* plaintiffs sought by way of injunction to have the District Court in effect review action by FERC on matters relating to the rescinding of a permit. The court held:

When the Commission refused to rescind its permit, the proper remedy for the [plaintiff], if it was dissatisfied with the decision, was to petition for a rehearing by the Commission as provided and mandated by the [FPA]. If dissatisfied with the action of the Commission in denying rehearing, the exclusive jurisdiction to review a decision of the Commission, whether it was to rescind the grant of a temporary permit or not, was then vested in the appropriate Court of Appeals. There is no *de novo* jurisdiction in either the State or District Court to review, reverse or invalidate the action of the Commission in ruling on such petition to rescind.

*Id.* at 652.

■ In this case, plaintiffs are dissatisfied with PASNY's ice control procedures and are seeking an injunction that will: (1) require PASNY to adhere strictly to the procedures outlined in the *Niagara River Ice Control Manual;* and (2) require the Court to monitor and determine matters related to the flow and diversion of water from the Niagara River. However, pursuant to the NRA, Congress directed FERC to issue a license to PASNY in conformity with the provisions of the FPA and thereby reposited with FERC the exclusive jurisdiction over such operational aspects of the license. It is FERC, and not this Court, that has the power and the expertise to decide if the license was violated or if the current operating procedures should be changed. Thus, plaintiffs should have initially filed a complaint with FERC pursuant to 16 U.S.C. § 825e. If they were dissatisfied by FERC's determination, they then should have exhausted their administrative remedies and ultimately appealed to the Second Circuit Court of Appeals. It is the Court of Appeals, not the District Courts, that have sole jurisdiction over questions arising under FERC licenses. *California Save Our Streams Council v. Yeutter,* 887 F.2d 908, 911 (9th Cir.1989).

Even if the Court did have jurisdiction, it would nonetheless decline to exercise it in deference to FERC's primary jurisdiction over the issues raised. *Allegheny Elec. Coop. Co.,* 630 F.Supp. at 1275 (citations omitted).

Primary jurisdiction is a doctrine that governs the question of whether a particular issue or claim is initially cognizable in a court action or must be presented to an administrative agency for determination in the first instance. A court having concurrent jurisdiction with an administrative agency may rely upon the doctrine of primary jurisdiction to return the case to the agency when faced with an issue that calls into question an area of special expertise of an agency.

*Id.* at 1275 (citations omitted).

In the instant case, plaintiffs have raised issues that involve the day-to-day operation of the Niagara Project. These issues clearly fall within an area of special expertise of FERC and, therefore, should be addressed by FERC in the first instance.

## C.

### PENDENT JURISDICTION

■ A federal court may exercise pendent jurisdiction over state law claims "whenever the federal law claims and state law claims in the case derive from a com-

mon nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (citations omitted). "The decision to exercise pendent jurisdiction is within the discretion of the district court" and, in exercising that discretion, the court should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction." *Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 563 (2d Cir.1991) (citations omitted). However, " 'if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.' " *Castellano v. Bd. of Trustees,* 937 F.2d 752, 758 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 378, 116 L.Ed.2d 329 (U.S.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).

While dismissal of pendent state claims is not absolutely mandatory, *Rosado v. Wyman,* 397 U.S. 397, 403–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970), the basis for retaining pendent jurisdiction is weak when, as here, the federal claims are dismissed before trial. *Baylis v. Marriott Corp.,* 843 F.2d 658, 664 (2d Cir.1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie–Mellon Univ.,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7.

In the case at hand, both plaintiffs and defendant assert that the Court should exercise pendent jurisdiction over plaintiffs' state law negligence claim even if it decides, which it has, that the federal § 803(c) claim should be dismissed. The parties argue that the Court should maintain pendent jurisdiction in the interests of judicial economy and fairness. They point out that the case is already six years old and that both the Court and the parties have spent sub-

stantial resources in getting the case into a trial-ready posture. Thus, the parties argue, it would be an abuse of discretion for the Court to decline to exercise pendent jurisdiction over plaintiffs' remaining state law negligence claim. The Court disagrees.

First, the strong interests of federalism and comity in this case point toward divestiture of pendent jurisdiction. As stated earlier, the legislative history of the FPA clearly establishes that Congress was determined not to infringe the traditional jurisdiction of the States in the areas of property rights and tort liability. In enacting § 803(c), Congress was merely preserving the rights of injured riparian property owners to sue licensees in state court under state law. The exercise of pendent jurisdiction in this case would run contrary to Congress' pronounced intent not to invade the jurisdiction of the States. Thus, the interests of federalism and comity strongly support dismissal of the state law negligence claim.

■ Furthermore, the Second Circuit has recently held that "[t]he judicial economy factor should not be the controlling factor, and it may be appropriate for a court to relinquish jurisdiction over pendent claims even where the court has invested considerable time in their resolution." *Kidder, Peabody & Co.,* 925 F.2d at 564 (citing *Powell v. Gardner,* 891 F.2d 1039, 1047 (2d Cir.1989) (even after a trial on the merits of the § 1983 claim, the district court properly dismissed pendent state law claims after directing a verdict in favor of defendant on the § 1983 claim); *Dunton v. County of Suffolk,* 729 F.2d 903, 910 (2d Cir.1984) ("Even if the federal claims are discovered to be patently meritless only after the trial begins, once that discovery is made the state claims must be dismissed along with the federal ones."). Thus, the parties' judicial economy argument, while having merit, is not controlling.

Moreover, while the Court and the parties have spent time and resources getting

the case ready for trial, the parties would not be prejudiced by dismissal of plaintiffs' state law claim at this time. Because their state law claim is not being terminated by voluntary dismissal, failure to prosecute or judgment on the merits, plaintiffs may assert the same claim in state court within six months of the date of this decision. N.Y.Civ.Prac.L. & R. § 205(a); *Dunton,* 729 F.2d at 911 n. 8. Both parties represented to the Court that they were ready for trial. Thus, if or when plaintiffs file suit in state court, the parties should be able to proceed to trial in short order.[7]

7. The Court notes that, due to its crowded criminal trial calendar, the earliest trial date for this case in this Court would not be until the Fall of 1992.

## IV.

### *CONCLUSION*

For the reasons stated, the Court dismisses plaintiffs' first cause of action for failure to state a claim upon which relief can be granted. Further, the Court dismisses plaintiffs' request for injunctive relief for lack of subject matter jurisdiction. Finally, the Court declines to exercise pendent jurisdiction over plaintiffs' state-law negligence claim and dismisses plaintiffs' second cause of action.

It is so ordered.

APPENDIX A