**NEZ PERCE TRIBE, Plaintiff,**

v.

**IDAHO POWER COMPANY, Defendant.**

**Civ. No. 91–0517–S–HLR.**

United States District Court,
D. Idaho.

March 21, 1994.

Walter H. Bithell, Holland & Hart, Boise, ID, Peter C. Houtsma, M. Julia Hook, Richard G. Schneebeck, Stephanie D. Welsh, Holland & Hart, Denver, CO, Douglas Nash, Nez Perce Tribal Executive Committee, Office of Legal Counsel, Lapwai, ID, for plaintiff Nez Perce Tribe.

John D. Lowery, Riddell Williams Bullitt & Walkinshaw, Michael Mirande, Bogle & Gates, Seattle, WA, James C. Tucker, Rosholt Robertson & Tucker, Boise, ID, for Idaho Power Co.

### ORDER ADOPTING FIRST REPORT AND RECOMMENDATION

RYAN, Senior District Judge.

### I. INTRODUCTION

On July 30, 1993, United States Magistrate Judge Larry M. Boyle entered his Report and Recommendation in the above-entitled action, attached hereto as Exhibit A. In his Report and Recommendation, Judge Boyle recommends that this court grant the defendant's Motion for Summary Judgment as to all claims set forth in the plaintiff's Amended Complaint.

Pursuant to 28 U.S.C. § 636(b)(1), the parties had ten days in which to file written objections to the recommendations of Judge Boyle. The court granted the plaintiff an extension of time to file its objections, pursuant to a stipulation entered into by the parties. On August 13, 1993, the plaintiff filed its objections to the Report and Recommendation. Thereafter, on August 30, 1993, the defendant filed its response to the objections.

## II. DISCUSSION

In light of the objections filed by the plaintiff, the court is required to engage in a de novo review pursuant to 28 U.S.C. § 636(b)(1). The court has engaged in an exhaustive and detailed review of the entire record in this matter, including all of the memoranda, affidavits, and exhibits filed by the parties in relation to the Motion for Summary Judgment, as well as the plaintiff's objections to the Report and Recommendation and the defendant's response. The court has also reviewed the cases cited by the parties in their memoranda and by Judge Boyle in his Report and Recommendation. Having conducted this thorough and independent review of the record, in light of the facts presented in this case and the substantive law applicable thereto, this court finds that Judge Boyle did not err when he concluded that the defendant's Motion for Summary Judgment should be granted.

In its objections, the plaintiff does not offer the court any new authority which would cause it to reverse or modify the Report and Recommendation of Judge Boyle. Nor does the plaintiff offer any new evidence in support of its contentions. The plaintiff simply restates the arguments made to Judge Boyle which he carefully considered and rejected.

With respect to the Motion for Summary Judgment, the court notes that its findings are based upon a careful review of the facts, which has been conducted with the principle in mind that the facts are to be viewed in the light most favorable to the plaintiff as the nonmoving party. In summary, the court is simply not persuaded that the Report and Recommendation entered by Judge Boyle on July 30, 1993, warrants modification. On the contrary, the court commends Judge Boyle for his erudite and well-reasoned decision which is well founded in both law and fact. The court finds it unnecessary to explain to the plaintiff again the reasons why it may not recover money damages from this defendant for diminished salmon runs. Rather, the court hereby incorporates the findings, reasoning, and conclusions of Judge Boyle by reference in this order.

The court notes that in the Report and Recommendation entered July 30, 1993, Judge Boyle appropriately did not address the plaintiff's claim for damages for inundation of usual and accustomed fishing places. The conversion claims were apparently raised for the first time at oral argument and were not clearly pleaded in the Amended Complaint. After consideration, this court again referred the defendant's Motion for Summary Judgment to Judge Boyle for an additional hearing and the preparation of a supplemental report and recommendation on this narrow issue.

In light of these developments, the court will grant the defendant's Motion for Summary Judgment as to all claims and issues, and on all grounds addressed by Judge Boyle in his Report and Recommendation entered July 30, 1993. The court will deny the motion without prejudice as to the plaintiff's final remaining claim for compensation based on exclusion from its usual and accustomed fishing places. The court will delay entering its final ruling on this last claim until after all objections and responses to objections have been filed with respect to the Second Report and Recommendation entered by Judge Boyle on February 28, 1994.

## III. ORDER

Based on the foregoing and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the findings, reasoning, and conclusions contained in the Report and Recommendation entered on July 30, 1993, should be, and are hereby, ADOPTED in their entirety and INCORPORATED herein by reference.

IT IS FURTHER ORDERED that defendant's Motion for Summary Judgment, filed September 18, 1992, should be, and is hereby, GRANTED as to all claims set forth in the plaintiff's Amended Complaint except the plaintiff's claim for compensation based on exclusion from its usual and accustomed fishing places. The motion is DENIED WITHOUT PREJUDICE as to this remaining claim at this time. The court will enter its final ruling on this claim as explained above.

794

## EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

NEZ PERCE TRIBE,

Plaintiff,

v.

IDAHO POWER COMPANY,

Defendant.

Case No. CV 91–0517–S–HLR

REPORT AND RECOMMENDATION

BOYLE, United States Magistrate Judge.

### I.

### *INTRODUCTION*

The Nez Perce Indian Tribe (hereinafter the "Tribe") brought this action seeking an award of monetary damages from Idaho Power Company for the negative effect the power company's construction and maintenance of three dams on the Snake River has had on the fall and spring chinook and steelhead runs. Idaho Power Company and/or its predecessors (hereinafter "Idaho Power") began construction of the dams in 1955, when the Federal Power Commission issued it a license pursuant to the Federal Power Act (hereinafter "FPA"), 16 U.S.C. § 791a *et seq.* Pursuant to that license, the Hell's Canyon dam, the Oxbow dam and the Brownlee dam (hereinafter the "Hell's Dam Complex") were constructed during the mid 1950's and early 1960's.

The Tribe bases its claims on the terms of the 1855 treaty with the United States which reserved to the Tribe exclusive rights to take fish in streams "where running through or bordering" its reservation, as well as "the right of taking fish at all usual and accustomed places in common with citizens of the Territory." Art. III, Treaty with the Nez Perce, 12 Stat. 957 (June 11, 1855) (hereinafter the "treaty").

The Tribe alleges that the manner in which Idaho Power has constructed and operated the Hell's Dam Complex violates its treaty fishing rights by reducing the number of fish on the annual runs and claims it is entitled to compensation for that loss in the form of monetary damages.[1] Idaho Power denies that it constructed or operated the Hell's Dam Complex in a negligent manner or that it has violated FPA regulations. However, neither party disputes that the number of salmon and steelhead in the Snake River has greatly declined since the Hell's Dam Complex was commenced in the mid 1950's.

Idaho Power asserts that the fish conservation issues posed by the Hell's Dam Complex were finally determined as a result of a 1976 petition filed with the Federal Energy Regulatory Commission (hereinafter "FERC") by the Fish and Game agencies of the states of Idaho, Oregon and Washington. In the 1976 petition, the three states sought a declaratory order pursuant to section 10(a) of the FPA requiring Idaho Power to expand and renovate the Rapid River, Pahsimeroi River and Niagara Springs hatcheries and to produce greater numbers of juvenile fish in those facilities. The Tribe intervened in that action in August, 1977. Negotiations among the parties resulted in a settlement agreement dated February 14, 1980, executed by the United States Department of Commerce, the states of Washington, Idaho and Oregon, and Idaho Power. The Tribe participated in those negotiations but did not sign the settlement agreement. The parties to the settlement agreement agreed that their compromise would settle all issues concerning the actual number of salmon and steelhead destroyed by the Hell's Dam Complex. All three states, but not the Department of Commerce, also agreed that the settlement agreement would constitute full and complete mitigation for all numerical losses of salmon and steelhead caused by Idaho Power. In its Order of February 27, 1980 (hereinafter "Order") FERC approved the settlement agreement.

---

1. *See* Nez Perce Statement of Disputed Facts in which the Tribe alleges numerous license and regulatory violations by Idaho Power in the construction and operation of the dams between 1950 and 1980.

Although the Tribe intervened in the action and participated in the negotiations, it contends that it is not bound by the Order because it did not sign the settlement agreement and because Idaho Power has failed to comply with the terms and requirements of the settlement agreement.

## II.

### *SUMMARY OF THE COURT'S OPINION*

Currently before the Court is Defendant's Motion for Summary Judgment (Docket No. 31) wherein Idaho Power contends that it should be granted summary judgment on the grounds that the Tribe does not have a valid claim or cause of action for monetary damages. In the alternative, Idaho Power asserts that because Congress intended the FPA to be a comprehensive plan of development, it preempts any common law claim for damages asserted by the Tribe. Further, Idaho Power argues that the FERC Order of February 27, 1980 precludes any action by the Tribe for monetary damages because the Order constituted a final determination of the Tribe's fishing losses. Finally, Idaho Power contends that even if the Tribe has a state common law cause of action for damages, the United States courts do not have subject matter jurisdiction to hear that action.

The Tribe responds by asserting that it has both a state and a federal common law cause of action for damages, neither of which has been preempted by the FPA. The Tribe asserts that even if this Court finds that the Tribe's cause of action is grounded in state common law, that this Court has jurisdiction pursuant to 16 U.S.C. § 803(c). In the alternative, the Tribe argues that rather than preempting its cause of action, 16 U.S.C. § 803(c) expressly provides the Tribe with an action for monetary damages to its property. Finally, the Tribe asserts that it is not precluded by the 1980 FERC Order because it did not sign the settlement agreement and also because the Order addresses only mitigation of the Hell's Dam Complex's effect on the fish runs and not the issue of monetary damages for the loss of the fish runs.

After a careful and extensive review of the record, the Court is of the opinion that the Tribe does not have a legally cognizable cause of action for an award of monetary damages.

The United States courts have subject matter jurisdiction to hear any Tribal claim for protection of rights created by United States treaty. *See* 28 U.S.C. § 1362. Accordingly, in the Court's view, the federal courts have subject matter jurisdiction to hear and determine the state common law claim alleged by the Tribe.[2]

The Court also concludes that because FERC does not have jurisdiction to award monetary damages, FERC could not have considered the Tribe's present damage claims and, therefore, the 1980 FERC Order does not preclude the Tribe from bringing an action for damages here.[3]

Having concluded that the United States courts have jurisdiction to hear this proceeding and that the 1980 FERC Order does not bar consideration of this instant action, the Court will analyze and resolve in this Report and Recommendation all of the substantive issues presented herein by the parties. The Court has considered each of the Tribe's asserted grounds for an award of monetary damages, i.e. 16 U.S.C. § 803(c), federal common law and state common law.[4] In the Court's view, Congress intended section 803(c) to preserve existing causes of action, but not to create new ones. The Court has studied the extensive case law on this issue and concludes that there is no legal precedent establishing a cause of action for monetary damages due to violation of tribal treaty fishing rights on the grounds of reduction of the number of fish available to catch. The Court concludes that the primary reason that Indian tribes have not been awarded damages for their treaty fishing rights in the past is because the tribes do not own the fish, but only have a treaty right which provides an opportunity to catch fish if they are present at the accustomed fishing grounds. In the

---

**2.** *See* Section III.A.1., p. 796.

**3.** *See* Section III.A.2., p. 800.

**4.** *See* Section III.B.1–3., p. 803.

Court's view, monetary damages for loss of property cannot be awarded for injury to a fish run in which the plaintiff tribe owns only an opportunity to exploit.

The Tribe has asserted that if it does not have a cause of action for monetary damages stemming from injury to the fish runs, its treaty fishing rights are meaningless. In this respect, the Court has examined the effect that changing circumstances, such as the construction of the Hell's Dam Complex, has had on tribal treaty fishing rights in the past.[5] After careful analysis, the Court concludes that while treaty fishing rights are subject to changes in circumstances, the treaty fishing rights that the tribes reserved to themselves have not been rendered meaningless because of the hatchery facilities and other mitigation and protection programs.

Having concluded that the Tribe does not have a cause of action for an award of monetary damages, and that the lack of such a remedy does not "nullify" the Tribe's treaty fishing rights, the Court has also seriously considered whether it is able to establish a new cause of action for the Tribe.[6] After extensive analysis and consideration, this Court declines to create a new cause of action for several reasons. First, the FPA is sufficiently broad and comprehensive that it would preempt almost any, if not all, causes of action the Court might devise. Second, the creation of federal common law is a disfavored expedient. Finally, the injunctive remedies already available, the Clean Water Act, the Endangered Species Act, and the FPA itself, all provide some degree of protection for the fish runs.

Finally, the Court has reviewed the Fed. R.Civ.P. 56 summary judgment standard and concludes that even assuming that all of the Tribe's factual allegations as to the significant damage to the fish runs are true, the Tribe would still not have a cause of action for an award of monetary damages.[7] Therefore, inasmuch as there are no genuine issues

of material fact, this Court recommends that Defendant's Motion for Summary Judgment be GRANTED.

## III.

### ANALYSIS AND ORDER OF THE COURT

After an in-depth review of the parties' briefs and having read and considered the many cases, statutes, treaties and other authorities cited and relied upon by the parties, and having conducted its own extensive research, it is clear that the threshold question presented here is whether the Tribe has a legally cognizable action for monetary damages due to the destruction of the Snake River salmon and chinook fish runs caused by the construction and operation of the Hell's Dam Complex. In essence, the Tribe is seeking an award of monetary damages stemming from the destruction of a natural resource, i.e. the Snake River chinook salmon and steelhead, to which the Tribe clearly has treaty fishing rights to fish at all of their usual and accustomed places.

However, before this ultimate question can be resolved, the Court must consider the asserted procedural bar issues raised by Idaho Power relating to the Court's subject matter jurisdiction, and the effect of the 1980 FERC Order on the instant proceedings.

#### A. Asserted Procedural Bars

Idaho Power contends that the Court should not consider the merits of the instant action because it does not have subject matter jurisdiction over the action or, in the alternative, because FERC's 1980 Order was a final decision on the merits of the claims which the Tribe has raised in this action. In the Court's view, Idaho Power's position on both issues is without merit.

#### 1. Subject Matter Jurisdiction

It is well established that "subject matter jurisdiction ... must be raised *sua sponte* by a federal court when there is an indication that jurisdiction is lacking."[8] Therefore, this

---

5. *See* Section III.B.4., p. 813.

6. *See* Section III.B.5., p. 815.

7. *See* Section IV., p. 817.

8. *Alumax Mill Prods., Inc. v. Congress Fin. Corp.,* 912 F.2d 996, 1002 (8th Cir.1990) (*quoting Hughs v. Patrolmen's Benevolent Ass'n of City of New York, Inc.,* 850 F.2d 876, 881 (2nd Cir.) *cert.*

Court will begin by first considering and determining whether it has jurisdiction to consider the matters at issue in the instant action.

Idaho Power contends that if the Tribe's cause of action is based upon state common law, the United States courts do not have subject matter jurisdiction over the matters raised herein. The Tribe argues that it has: [1] a state common law cause of action preserved by 16 U.S.C. § 803(c); [2] a federal common law cause of action not preempted by the FPA; and [3] a federal cause of action created by 16 U.S.C. § 803(c). Idaho Power's contention that this Court lacks subject matter jurisdiction relates only to the Tribe's claim that it has a state common law cause of action.[9]

It is obvious that the Court has subject matter jurisdiction to consider a federal common law claim. Likewise, if 16 U.S.C. § 803(c) creates a federal cause of action, this Court would have jurisdiction over that action. See 16 U.S.C.A. § 825p.[10] However, the Tribe also contends that 16 U.S.C. § 803(c) creates original jurisdiction in the United States district courts to hear any state law claims brought under 16 U.S.C.A. § 803(c), which is one of the nine "Conditions of License" listed in the FPA and provides in pertinent part:

> Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.

As written, the above statutory condition provides that the licensee is liable to property owners for all damages caused by its activities. The statute is primarily for the benefit of the United States because it exculpates the government from liability for the actions of licensees. Although this statutory condition preserves causes of action against licensees for damages to property, it does not expressly address whether the United States district courts have jurisdiction to hear the preserved causes of action.

A review of the legislative history of the FPA discloses the "vigorous determination of Congress ... to avoid unconstitutional invasion of the jurisdiction of the States." *First Iowa Hydro–Electric Cooperative v. Federal Power Com.*, 328 U.S. 152, 171, 66 S.Ct. 906, 915, 90 L.Ed. 1143 (1946). The legislative history of section 803(c) itself is representative of Congress' determination to avoid impinging upon a state's jurisdiction. After an extensive examination of the legislative history of section 803(c) in an action brought to determine whether the FPA created United States district court jurisdiction, the D.C. Circuit Court summarized the Congressional record as follows:

> The original version of § 10 [16 U.S.C. § 803(c)] reported to the House of Representatives by the Committee on Water Power provided that "[n]o license hereunder shall have the effect of relieving the licensee from liability for any injury or damage occasioned by the construction, maintenance, or operation of said project works; and the United States shall in no event be liable therefor." During the floor debate in the House, Representative Graham of Illinois suggested that the provision be amended to require that, before they began construction, licensees make settlement or compensation for all damages caused by the construction of their projects according to the laws of the state where the project was to be built. See 56 Cong.Rec. 9913–14 (Sept. 3, 1918). Although Representative Dempsey objected to the amendment on the ground that it would be impracticable to make the parties

denied, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988)).

9. Idaho Power does not concede that the Tribe has a cause of action for monetary damages, whether based upon state or federal law.

10. 16 U.S.C.A. § 825p provides in part:

> The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, [the FPA].

settle "in advance before they can know the amount of the settlement," no participant in the floor debate questioned the premise that damages should be determined according to state law. *See id.* Thus, both the Graham amendment, which was accepted, *see* Cong.Rec. 9972 (Sept. 4, 1918), [footnote omitted] and the language of the original provision demonstrate that the House intended for damages (whether ascertained before or after construction) to be determined in accordance with state law. Nothing in the legislative history indicates that this understanding was ever altered during later discussions of the Act [the FPA]. In particular, while the amendment requiring payment before construction was superceded, in conference with the Senate, by the current language of § 10(c) [16 U.S.C. § 803(c) ], the Conference Report, H.R.Rep. No. 1147, 65th Cong., 3d Sess. 16 (1919), does not indicate any intention to abandon the principle that property damages caused by licensees should be determined in accordance with state law.

*South Carolina Public Service Authority v. FERC,* 850 F.2d 788, 794–95 (D.C.Cir.1988).

In addition, the legislative history of section 803(c) has been analyzed as follows:

During the course of House debate on the bill, in the years prior to passage of the Federal Water Power Act, Representative LaFollette of Washington, a member of the Special Committee on Water Power, stated: "The property rights are within the State. It can dispose of beds, or parts of them, regardless of the riparian ownership of the banks, if it desires to, and that has been done in some States. If we put this language, [§ 9(b) ] which is practically taken from the Supreme Court decision [*United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746], as to the property rights of the States as to the bed and the banks and to the diversion of the water, then it is sure that we have not infringed

any of the rights of the States in that respect, or any of their rules of property, and we are trying in this bill above everything else to overcome a divided authority and pass a bill that will make it possible to get development. We are earnestly trying not to infringe the rights of the States. If possible we want a bill that cannot be defeated in the Supreme Court because of omissions, because of a lack of some provision that we should have put in the bill to safeguard the States." 56 Cong.Rec. 9810 (1918).

*DiLaura v. Power Authority of New York,* 786 F.Supp. 241, 248, n. 4 (W.D.N.Y.1991), *aff'd,* 982 F.2d 73 (2nd Cir.1992).

Based upon the above legislative history, and the Supreme Court's admonition against interpretations of the FPA which create a "futile duplication of two authorities over the same subject matter," [11] the D.C. Circuit Court held that the federal courts did not have jurisdiction over state causes of action preserved by section 803(c). *Id.* at 248–49.

Applying these principles, the court in *DiLaura* concluded:

Congress did not intend for the determination of when licensees would be liable to their neighbors for property damages to be made in federal court. Instead, Congress intended that such a determination would "remain under the jurisdiction of the States," and would be decided exclusively by state courts applying state tort law. [footnote omitted] *See South Carolina Pub. Serv. Auth.,* 850 F.2d at 795.

*DiLaura,* 786 F.Supp. at 247.

This Court agrees with the analysis and holdings in *DiLaura* and *South Carolina Pub. Serv. Auth.* to the extent that Congress did not intend to grant the federal courts subject matter jurisdiction over state law causes of action which were preserved by 16 U.S.C. § 803(c).[12] Thus, it would appear that the federal courts have jurisdiction to hear only those claims which are based upon

---

**11.** *First Iowa Hydro–Electric Cooperative v. Federal Power Com.,* 328 U.S. at 171, 66 S.Ct. at 915 (as quoted by *South Carolina Public Service Authority v. FERC,* 850 F.2d at 795.)

**12.** Obviously, if there existed diversity of citizenship between the parties, this Court would have subject jurisdiction under 28 U.S.C. § 1332. *See Dilaura,* 786 F.Supp. at 247 n. 5.

either federal common law or upon the FPA. In addition, 28 U.S.C.A. § 1362 provides:

> The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

■ In the instant action, it is beyond any reasonable dispute that the Tribe's fishing rights and their claims in this regard are derived from the 1855 treaty. The courts have consistently held that 28 U.S.C. § 1362 creates federal jurisdiction when an Indian tribe brings a tort action, if the interest which the tribe alleges to have been injured or damaged is created by treaty or other federal law. In *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), the United States Supreme Court considered whether the district court had jurisdiction to determine a quiet title action brought by the Oneida Tribe:

> Here, the right to possession itself is claimed to arise under federal law in the first instance. Allegedly, aboriginal title of an Indian tribe guaranteed by treaty and protected by statute has never been extinguished.
>
> . . . .
>
> [T]he assertion of a federal controversy does not rest solely on the claim of a right to possession derived from a federal grant of title whose scope will be governed by state law. Rather, it rests on the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession. For the same reasons, we think the complaint before us satisfies the additional requirement formulated in some cases that the complaint reveal a "dispute or controversy respecting the validity, construction, or effect of such a law, upon the determi-

nation of which the result depends." [citations omitted, footnote omitted]. Here, the Oneidas assert a present right to possession based in part on their aboriginal right of occupancy which was not terminable except by act of the United States. Their claim is also asserted to arise from treaties guaranteeing their possessory right until terminated by the United States, and 'it is to these treaties (that) we must look to ascertain the nature of these (Indian) rights, and the extent of them.' [citation omitted] ... To us, it is sufficiently clear that the controversy stated in the complaint arises under the federal law within the meaning of the jurisdictional statutes and our decided cases.

414 U.S. at 676–78, 94 S.Ct. at 782–83.

The principle quoted above has also been applied to actions brought against private defendants. In *Mescalero Apache Tribe v. Burgett Floral Co.*, 503 F.2d 336 (10th Cir. 1974) the court, citing *Oneida*, held that because the Apache Tribe's title to its reservation land was confirmed by treaty, that it had original jurisdiction over the Oneida Tribe's action against defendants for allegedly entering onto the reservation and destroying trees. *Id.* at 338.

However, an opposite result occurred in *Chilkat Indian Village v. Johnson*, 870 F.2d 1469 (9th Cir.1989) wherein the Chilkat Indian Village brought an action for possession of four carved wooden posts and a wooden partition called a rain screen. The Chilkat Indians alleged both conversion and violation of a tribal ordinance prohibiting taking traditional Indian artwork from either reservation or private land owned by the tribal members without the permission of tribal counsel. *Id.* at 1471. The United States district court ruled, *sua sponte*, that it did not have jurisdiction over either the conversion claim or the violation of tribal ordinances. On appeal, the Ninth Circuit agreed that the tribe's conversion claim did not raise a question of federal law and distinguished *Oneida* as follows:

> The Village strongly asserts that its possessory interest arises under and is protected by federal law, but it has neither alleged nor offered any factual or legal

bias for that assertion. The artifacts are not alleged to be trust property, nor property held pursuant to federal statute or federal common law. Whatever proprietary interest the Village has in the artifacts is a creature of tribal law or tradition wholly unconnected with federal law. No construction of federal law is necessary to adjudicate title. The claim is therefore entirely different from the claim successfully maintained in *Oneida* [citation omitted]. In that case, the Oneida Nation was suing on a possessory interest, a right of occupancy, that had been shaped and protected by federal common law, reinforced by a treaty and the federal Nonintercourse Acts [citations omitted]. No such federal foundation underlies the Village's conversion claims in this case.

*Id.* at 1472–73. In the instant action, however, the Tribe's right to fish is aboriginal in origin, as it was in *Oneida,* and is reinforced by federal common law and the 1855 treaty. As will be discussed hereinbelow, there is substantial federal case law devoted to the determination of infringements of Indian fishing treaty rights.

Accordingly, after a careful consideration of the issues, this Court concludes pursuant to 28 U.S.C. § 1362 and the Supreme Court's holding in *Oneida* that the United States courts have subject matter jurisdiction over the Tribes' claim in this action alleging that its treaty fishing rights have been violated.[13]

### 2. *1980 FERC Order*

■ Having determined that the Court has subject matter jurisdiction over the Tribe's claims, it will now consider Idaho Power's contention that the 1980 FERC Order was a final determination of the Tribe's claims which precludes it from bringing the present action. In the Court's opinion, the present action is not barred by the 1980 administrative proceeding because the nature

of this litigation differs significantly from the FERC proceedings. In the FERC action, the primary matters at issue were the conditions of Idaho Power's license. The resulting settlement agreement concerned what action Idaho Power would be required to take to mitigate the anadromous fish losses caused by the Hell's Dam Complex. The FERC proceeding was concerned with and limited to regulatory requirements, whereas the instant action is an action for monetary compensation for damage to the Tribe's asserted fishing rights.[14]

It is clear that FERC does not have jurisdiction to adjudicate property disputes or to award monetary damages. In *South Carolina Public Service Authority v. FERC,* 850 F.2d 788, the South Carolina Public Service Authority (hereinafter the "Authority") appealed one of the conditions imposed by FERC for the renewal of its FPA license on the Santee North Dam. The challenged condition was that the Authority provide compensation for all foreseeable property damage caused by seismically induced dam failure. *Id.* at 789. In that proceeding, the Authority contended that FERC did not have jurisdiction to impose liability for property damages. In response, FERC argued that because sections 10(a) and (c) of the FPA obligated it to ensure that each project is safe before licensing it, FERC's requirement that the Authority compensate its neighbors for property damages resulting from an earthquake-induced flooding was a proper exercise of its authority. *Id.* at 792. On appeal, the D.C. Circuit Court of Appeals disagreed and held:

> We find this proposition ... troubling. This is apparently the first time an agency authorized to regulate in the interest of safety has interpreted that authority to support a compensation scheme. The dearth of authority to support the Commission's [FERC] interpretation, which equates "the protection of ... property"

---

13. Although the Court finds that it has subject matter jurisdiction to determine the matter of tortious interference with the Tribe's treaty fishing rights, it reserves for discussion the question of whether the Tribe has a cause of action for monetary compensation for injuries to the fish runs.

14. Whether the Tribe's treaty right to the fish is the kind of property right for which this Court can award damages to compensate for injury to the fish will be addressed.

with "compensation for damage to property," is not surprising: "compensation" bears little resemblance to "protection" as those terms are used in ordinary language or in statutes regulating various hazards. Unlike a requirement that a licensee take a measure to prevent a loss from occurring, such as installing an alarm system or rebuilding a dam, the compensation condition does not contribute in any way to the protection of property. Instead, it merely substitutes the Commission's preferred rule of compensation for existing state law in the event that the earth should move and the dam give way. We do not believe that Congress intended such a result when it authorized the Commission to issue licenses and to condition those licenses upon conformity to "regulations ... for the protection of ... property." The impossibility of the Commission's position is manifest when one considers the linguistically necessary implication, namely, that it could also require compensation for death or disease in lieu of "protection of life [and] health."

*Id.* at 792.[15]

In *South Carolina Public Serv. Auth.*, the D.C. Circuit Court of Appeals also noted that while 16 U.S.C. § 803(c) specifically addressed the issue of property damages, that section merely preserves any existing cause of action under state law. *Id.* at 794.

In the 1980 Order, FERC acted only to protect the anadromous fish runs.[16] FERC did not, and indeed could not, order monetary compensation for past or present injury to the fish runs. In the present action, the Tribe seeks such monetary compensation for injury to the fish runs. Such an action is properly brought in the courts, not before FERC. Therefore, as the matter was not, and could not have been, at issue therein, the Court concludes that the Tribe's action for damages to its treaty fishing rights is not barred by the 1980 FERC Order.[17]

Idaho Power also contends, in reliance on *Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) that because a favorable verdict for the Tribe may threaten the economic viability of the Hell's Dam Complex, this action is, in effect, a collateral attack on FERC's 1980 Order. In *Tacoma*, FERC granted a license to construct a facility on the Cowlitz River. The State of Washington intervened in FERC hearings to raise objections concerning the facility's adverse affects on the Cowlitz River. The State of Washington contended that the facility could not be built absent its approval. FERC granted the license and Washington State ultimately appealed FERC's Order to the Ninth Circuit, which confirmed FERC's Order. The Supreme Court denied certiorari. *Id.* at 323–29, 78 S.Ct. at 1211–15. In the face of the State's objections, the City filed an action in state court seeking a declaration that the bond issue the City contemplated using to finance to project was valid. The State responded, alleging that the project itself was contrary to state law. This time, however, the State based its objection on a different statute than the one it had relied on in its objections before FERC. The Washington trial court enjoined the City from constructing the facility and the Washington Supreme Court affirmed, holding that FERC could not grant the City power to condemn the State's hatch-

---

**15.** *See also Idaho Power Co.*, 29 F.P.C. 572 (1963) wherein FERC dismissed the State of Oregon's claim for damages caused by the negligence of Idaho Power Co., the licensee, in the operation of the Oxbow Dam; *BES Hydro Co.*, 41 F.E.R.C. ¶ 61,084 at 61,215 (1987).

**16.** Subsequent to entry of the 1980 FERC Order, Congress added 16 U.S.C.A. § 803(j) to the FPA:

(1) That in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning grounds and habitat) affected by the development, operation, and management of the pro-

ject, each license issued under this subchapter shall include conditions for such protection, mitigation, and enhancement.... [as amended 1986]

Similar to section 10 of the FPA, this section does not authorize FERC to award damages for injuries to wildlife, but rather requires it to take actions to protect wildlife.

**17.** However, the Court notes that mitigation efforts undertaken by Idaho Power may have lessened the injury its dam complex caused to the fish runs, thereby reducing the amount of damages the Tribe may ultimately recover, should it be allowed to proceed on the merits.

ery when state law did not provide the City with such authority. *Id.* at 329–33, 78 S.Ct. at 1215–17.

The United States Supreme Court reversed on the grounds that the State's action constituted an impermissible collateral attack on the FERC Order granting the license. The Supreme Court relied on 16 U.S.C. § 825*l* (b) which provides that jurisdiction of the federal courts in reviewing a FERC decision "shall be exclusive, to affirm, modify, or set aside such order in whole or in part" and that "[t]he judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part any such order of the commission, shall be final, subject to review by the Supreme Court. . . ." The Supreme Court held:

> This statute is written in simple words of plain meaning and leaves no room to doubt the congressional purpose and intent. It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had. . . . So acting, Congress in § 313(b) prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders. . . . It thereby necessarily precluded de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review. Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all.

*Tacoma,* 357 U.S. 320 at 335–37, 78 S.Ct. 1209 at 1218–19.

The Supreme Court continued by emphasizing that:

> [E]ven if it might be thought that this issue was not raised in the Court of Ap-

peals, it cannot be doubted that it could and should have been, for that was the court to which Congress had given "exclusive jurisdiction to affirm, modify, or set aside" the [FERC] Commission's order. And the State may not reserve the point, for another round of piecemeal litigation. . . .

*Id.* at 339, 78 S.Ct. at 1220.

After a careful review of the record and the cited legal authorities, this Court agrees with Idaho Power to the extent that if the Tribe had brought this action to amend the conditions of the 1980 FERC Order, or of Idaho Power's license in general, or to bar Idaho Power from operating the Hell's Dam Complex in compliance with its license, that the Tribe's action would be a collateral attack on the 1980 FERC Order. However, the Tribe's present action cannot reasonably be construed as a collateral attack on the 1980 FERC Order because the Tribe does not seek herein either to modify, rescind or otherwise alter the 1980 FERC Order, or to prohibit Idaho Power from availing itself of the privileges granted by the 1980 Order. Rather, in this instant action, the Tribe seeks monetary compensation for property damage, a remedy, which as discussed above, is not within FERC's jurisdiction. *See South Carolina Pub. Serv. Auth. v. FERC.*

Finally, Idaho Power contends that the Tribe's present action threatens the economic feasibility of the Hell's Dam Complex, and that to allow the Tribe to recover monetary damages would provide the Tribe with a "back door veto" over all hydro-electrical projects which affect tribal fishing rights. *See* Defendant's Memorandum in Support of Idaho Power Company's Motion for Summary Judgment, pp. 71–72. Idaho Power further contends that while Congress intended FERC to consider the recommendations of Indian tribes regarding natural resources (*see* 16 U.S.C.A. § 803(j)) [18], it did not intend

---

**18.** Section 803(j) provides:

(1) That in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning grounds and habitat) affected by the development, operation, and management of the project, each li-

cense issued under this subchapter shall include conditions for such protection, mitigation, and enhancement. Subject to paragraph (2), such conditions shall be based on recommendations received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*) [16 U.S.C.A.

to give any Indian tribe affected by a proposed power project a right to veto that project.

This Court agrees with Idaho Power to the extent that Congress did not intend to require FERC to accept the recommendations of Indian tribes. However, the Court cannot accept Idaho Power's further contention that because Congress gave the Indian tribes the right to advise FERC regarding mitigation of damage to wildlife, that Congress also intended to preclude any actions for damages to Indian property. Although FERC is required to consider the safety of the public when licensing power projects, its consideration of public safety clearly and obviously does not release the licensee from liability for any injury or damage it may cause to private property. *See* 16 U.S.C. § 803(c). Nor does FERC's determination that a project is economically feasible constitute a guarantee that it will be economically feasible. For example, if FERC licensed a project which would submerge private property, it is naturally to be expected that in determining the economic feasibility of the project, both FERC and the licensee would attempt to place a value on the submerged or otherwise damaged property. However, as discussed above, the state courts, not FERC, have the ultimate responsibility for determining the value of the submerged land and awarding damages. If the state court determined that the submerged land was substantially more valuable than FERC and the licensee had estimated, it is entirely possible that the owner's claim for damages would terminate the project. The courts could not justify, under those circumstances, preclusion of the submerged owner's action on the grounds that it constituted a back door veto of FERC's decision, no more

than it could justify precluding the Tribe's present action on the grounds that the Tribe's treaty fishing rights are worth more or are more valuable than FERC and Idaho Power had originally anticipated.

In summary, FERC does not have jurisdiction or authority to make an award of monetary damages, thus the Tribe's claim for an award of monetary damages is not barred by the 1980 FERC Order.

## B. Actions For Interference With Fish Runs

Having concluded in the preceding sections that the United States district court has subject matter jurisdiction over this action, and that the Tribe's action is not barred by the 1980 FERC Order, the Court will now consider whether the Tribe has a claim or cause of action for damage to or destruction of the fish runs to which its members have a treaty right to fish.

### 1. Section 803(c) Claims

In determining whether a federal statute provides a private litigant with a cause of action, the United States Supreme Court has held "[t]he ultimate issue is whether Congress intended to create a private cause of action...." *Karahalios v. National Federation of Federal Employees, Local 1263,* 489 U.S. 527, 532, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989) (quoting *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1778, 68 L.Ed.2d 101 (1981)). "Unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). To assist the courts in making this determination, the Su-

§ 661 *et seq.*] from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies.

(2) Whenever the Commission believes that any recommendation referred to in paragraph (1) may be inconsistent with the purposes and requirements of this subchapter or other applicable law, the Commission and the agencies referred to in paragraph (1) shall attempt to resolve any such inconsistency, giving due weight to the recommendations, expertise, and statutory responsibilities of such agencies. If, after such

attempt, the Commission does not adopt in whole or in part a recommendation of any such agency, the Commission shall publish each of the following findings (together with a statement of the basis for each of the findings):

(A) A finding that adoption of such recommendation is inconsistent with the purposes and requirements of this subchapter or with other applicable provisions of law.

(B) A finding that the conditions selected by the Commission comply with the requirements of paragraph (1).

preme Court has established a four part test: [1] is the plaintiff one of the class for whose benefit the statute was enacted; [2] is there any indication of legislative intent, implicit or explicit, to create or deny a private remedy; [3] would the creation of such a remedy be consistent with the underlying purposes of the legislative scheme; and [4] is the cause of action traditionally regulated by state law, in an area basically regulated by the states, making it inappropriate to infer a cause of action based solely on federal law. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

The above test was obviously intended to be applied to statutes which either prohibit an act or require an action, and not to a statute like 16 U.S.C. § 803(c) which provides on its face an action for an award of private monetary damages, but does not prohibit or require an act. Nevertheless, the test does give the Court an indication of the matters it should consider in determining whether section 803(c) creates a cause of action for monetary damages under these circumstances.

The language of section 803(c) makes it clear that the statute was intended to protect two parties: the United States, which it expressly protects from liability for property damage caused by the licensee; and owners whose property is damaged. Thus, to the extent that the Tribe's treaty fishing rights are considered property, the Tribe is a member of a class which the statute appears to protect.

However, it is clear from the legislative history of the section that Congress' intent when passing section 803(c) was to preserve existing state law causes of action, not to create new causes of action. (*See* discussion regarding the affect of 16 U.S.C. § 803(c) on

subject matter jurisdiction, pp. 796–800, *supra*.) Thus, in the Court's considered opinion, it is clear that Congress, in adopting section 803(c), did not intend to create a new private cause of action. Rather, it intended to preserve state common law rights. Most courts, when considering whether section 803(c) creates a new private cause of action, have reached the conclusion that it does not.[19] *DiLaura v. Power Authority of New York*, 786 F.Supp. 241 at 249 (*see* quoted portion of *DiLaura*, p. 798, *supra*).

Torts involving damage to property are an area of law traditionally regulated by state law. Thus, in this instant action the Court concludes that it would be inappropriate to imply or assume that section 803(c) creates a federal cause of action for property damage.

Finally, the Court notes that the FPA is a comprehensive regulatory scheme intended to foster the development of hydro-electric power. The Act also considers and creates compromises and provisions for the protection of wildlife, 16 U.S.C. § 803(j). Therefore, the courts should not judicially create further causes of action or implement additional protections from those already existing in section 803(c).

Accordingly, the Court concludes that 16 U.S.C. § 803 does not create a federal cause of action for monetary damages due to reduction in the number of fish in the runs. *See* authorities cited in footnote 19.

## 2. *Federal Common Law*

The Tribe contends that it has a federal common law cause of action for monetary damages based upon its 1855 treaty fishing rights and specifically seeks compensation for damages to a natural recourse (i.e. anadromous fish runs) which it has the right in common with non-treaty fishermen to exploit.[20] The Tribe's right to share in the

---

19. *See, e.g. South Carolina Pub. Serv. Auth.*, 850 F.2d at 794–95; *Pike Rapids Power Co. v. Minneapolis, St. P. & S.Ste. M. R. Co.*, 99 F.2d 902, 911–912 (8th Cir.1938), *cert. denied*, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939); *Beaunit Corp. v. Alabama Power Co.*, 370 F.Supp. 1044, 1050–1051 (N.D.Ala.1973); *Key Sales Co. v. South Carolina Elec. & Gas Co.*, 290 F.Supp. 8, 23 (D.S.C.1968), aff'd, 422 F.2d 389 (4th Cir. 1970); *Alabama Power Co. v. Smith*, 229 Ala. 105, 155 So. 601, 604 (1934).

20. In oral argument, the Tribe also advised the Court that it seeks damages for the loss of its usual and accustomed fishing places which were flooded by the Hell's Dam Complex:

"One final taking which occurred, Your Honor, and that is the taking of the usual and accustomed fishing spots, places upon which the Tribe previously had access to. They were simply flooded by these various dams. The dams created huge reservoirs in back of the

harvest of that natural resource was created by the 1855 treaty which reserved to the Tribe the exclusive right to take fish in streams "where running through or bordering" the Tribe's reservation as well as "the right of taking fish at all usual and accustomed places [off reservation] in common with citizens of the Territory." Art. III, Treaty with the Nez Perce, 12 Stat. 957 (June 11, 1855). The Tribe is not seeking damages for any infringement of its tribal members' ability to fish, or because other fishermen are taking an unfair proportion of the fish. Rather, the Tribe seeks an award of monetary damages for destruction of the quantity of fish in the runs. Thus, in the Court's view, a threshold question presented is whether the Tribe's treaty right to harvest fish from certain accustomed fishing places includes a right to bring an action for damages against licensees or other persons for damages arising from interference with the fish runs.

Idaho Power contends that the fishing rights reserved to the Indians under the 1855 treaty are subject to the effects of the passage of time and that the United States government can make policy choices which affect the available number of fish without violating its treaties with the various Indian tribes. Idaho Power argues that the need for electricity and the passage of the FPA constitute such a change in circumstances and that Congress knowingly limited the Indian's treaty rights when it passed the FPA. The Tribe argues, however, that although the United States government can make such a policy choice, to limit the Tribe's treaty fishing rights requires action on the part of Congress and that legislative body has not so expressly acted.

In response, Idaho Power asserts that Congress modified the 1855 treaty by passage of the FPA and further, that 16 U.S.C. § 803(c) was intended to apply only to state causes of action and argues that the Tribe's fishing rights are federal in nature. Finally, Idaho Power asserts that the nature of the Tribe's fishing rights preclude an award of monetary damages.

### a) *The 1855 Stevens Treaty*

The determination of all of the above questions is related to the nature and extent of the Tribe's treaty fishing rights. Therefore, it is necessary to examine the history of the Tribe's treaty fishing rights and the remedies which other courts have previously awarded to the Tribe in regard to those historical rights. The 1855 treaty at issue in the instant action was one of a number of

dams, and those reservoirs inundated our usual and accustomed fishing places. That, in a geographic sense, the nature of the right, has been recognized by the Ninth Circuit. That was a taking of our rights given to us under the 1855 treaty, for which there has been no compensation."

See *Nez Perce Tribe v. Idaho Power Co.*, Transcript, January 19, 1993 Hearing on All Pending Motions. Mr. Houtsma, p. 54, ll. 14–25.

The Tribe then went on to note that 16 U.S.C. § 814 provides Idaho Power and other licensees with a method of obtaining the land or property of others if it must take land in order to proceed with construction. See Transcript, January 19, 1993 hearing, pp. 60–61.

Section 814 provides:

When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. . . .

With the exception of the Tribe's Third Claim for Relief, the Plaintiff's Amended Complaint seeks damages for injury to its property rights but does not explain whether those rights are to the fish themselves, to the fish runs, or to the Tribe's fishing grounds. Plaintiff's Third Claim for Relief refers clearly to the right to possess "certain quantities of fish." The briefs submitted to this Court do not address the matter of preclusion from the historic fishing grounds. None of the affidavits or other evidence submitted to this Court suggests that the Tribe seeks damages for flooding of traditional fishing grounds. Therefore, the issue is not properly before the Court, and a claim for damages caused by the flooding of traditional fishing grounds or specific locations is not before the Court. See section 2(b), pp. 807–11, *infra*.

treaties (hereinafter referred to as the "Stevens treaties") negotiated by Territorial Governor Isaac Stevens with the various Pacific Northwest Indian Tribes during the mid 1800's. In addition to the Nez Perce treaty at issue here, the Treaty of Medicine Creek, Stat. 1132 (1853), Treaty with the Yakimas, 12 Stat. 951 (1855), and Treaty of Point Elliott, 12 Stat. 927 (1855) were all negotiated during this same general period of time. The United States negotiated these treaties for the purpose of extinguishing tribal claims to portions of what were then the Washington and Oregon Territories, in order to allow settlement of the region by its citizens.[21] In return for the Tribe's relinquishment of its claim to portions of what is now the northwestern United States, the United States made certain payments to the tribes and promised future assistance. The tribes reserved certain rights over the relinquished lands, including the rights to fish and hunt off-reservation. Typically, the reserved right to fish and hunt was exclusive on reservation lands and in common with non-tribal members on relinquished or off-reservation lands. Generally, in these treaties off-reservation rights to take fish were limited to "the usual and accustomed places."

Because of the similarity of these treaties, and the almost identical language employed therein, the United States Supreme Court has, when interpreting one of these treaties, generally looked to cases construing other Stevens treaties for guidance. The Ninth Circuit has likewise considered other Stevens treaties when construing Indian rights under the various treaties. *See, e.g. United States v. Oregon*, 718 F.2d 299, 301–302 & n. 2 (9th Cir.1983); *Sohappy v. Smith*, 529 F.2d 570, 573–574 (9th Cir.1976). Therefore, this Court will consider not only cases construing the 1855 Stevens treaty at issue here, but also cases and authorities construing other Stevens treaties in determining the Tribe's treaty rights asserted in this instant action.

In general, the Tribe's treaty rights to fish are limited geographically to their historical fishing grounds, and in instances where the

Indians have been precluded from their historic fishing grounds, the courts have awarded injunctions prohibiting others from interfering. *See United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) (fishing wheel destroyed access to fishing grounds); and *Confederated Tribes of Umatilla Indian Reservation v. Alexander*, 440 F.Supp. 553, 555 (D.Or.1977) (the Corp. of Engineers flooding Indian fishing stations with two hundred feet of water would violate treaty rights unless Congress gave specific approval of the project). In *Confederated Tribes of Umatilla*, the Supreme Court held that because Congress had authorized the taking of the Indian fishing stations, the United States government would have to compensate the tribe.

■ When interpreting Indian treaties, it is well established that certain canons are of special importance and the courts are required to consider the treaties' central purpose and construe the treaties as they were originally understood by the tribal representatives. In addition, the courts have traditionally resolved ambiguities in favor of the tribes and interpreted the treaties in the Indians' favor. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979) (hereinafter referred to as *"Fishing Vessel"*); *Jones v. Meehan*, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899); *Tulee v. Washington*, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); *Seufert Brothers Co. v. United States*, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919); *United States v. Winans*, 198 U.S. at 380–81, 25 S.Ct. at 663–64; as cited in *United States v. Washington*, 759 F.2d 1353, 1358 (9th Cir.1985).

In interpreting the several Stevens treaties, the courts have consistently held that the reserved fishing rights grant the Indians an "opportunity to take, by reasonable means, a fair and equitable share of all fish from any given run." *United States v. Oregon*, 769 F.2d 1410, 1416 (9th Cir.1985). Similarly, the United States District Court for Oregon has held that the tribes have a right to harvest "a fair share of the fish

---

**21.** For a general discussion *see Washington v. Washington State Commercial Passenger Fishing* *Vessel Ass'n*, 443 U.S. 658, 661–662, 99 S.Ct. 3055, 3062, 61 L.Ed.2d 823 (1979).

produced by the Columbia River system." *Sohappy v. Smith*, 302 F.Supp. 899, 911 (D.C.Or.1969). While construing the Medicine Creek Treaty, the United States Supreme Court in *Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, held that "[b]oth sides [Tribal and non-Tribal] have a right, secured by treaty, to take a fair share of the available fish." *Id.* at 684–85, 99 S.Ct. at 3074. According to this doctrine, the percentage of the total available fish the Tribe is entitled to take may be limited by tribal population, the abandonment of the fisheries by the tribal members as they find other means of support, and the number of fish necessary to provide the tribal members with a moderate living. *Id.* at 686–87, 99 S.Ct. at 3074–75. In any event, the maximum percentage of fish the Tribe is entitled to take was held by the United States Supreme Court in *Fishing Vessel* to be fifty percent (50%). *Id.*

It should be noted, however, that the "fair share doctrine" was adopted for the purpose of protecting Indians as well as non-treaty fishermen. In *Fishing Vessel*, the various state game and fishery departments argued that the treaties gave the Indians no more rights than that given to non-treaty fishermen with the exception of the right to cross over private land to access their usual and accustomed fishing grounds. *Id.* at 670–71, 99 S.Ct. at 3066–67. In *Fishing Vessel*, the Supreme Court held that the treaties reserved more to the Indians than the mere opportunity to fish, therefore, while both the Indians and the non-Indians have the right to fish, neither group may deny the other of their fair share of fish. *Id.* at 685, 99 S.Ct. at 3074. Thus, the fair share doctrine protects, as well as limits, the Tribe's treaty fishing rights.

In summary, the cases demonstrate that the relief granted to both treaty and non-treaty fishermen for violation of the fair share doctrine to this point in time has been injunctive, rather than monetary. Historically, according to *Fishing Vessel*, tribes deprived of their fair share of fish in one season are granted a larger percentage of fish in a subsequent season to make up the fair share deficit.

The Tribe's right to fish is also limited by the need to protect the fish runs from overharvest. It is well established that the states and the federal government can regulate the total treaty and non-treaty fish catch if regulation becomes necessary for the preservation of the species, is tailored to the conservation of that species, and is non-discriminatory in its treatment of the Indians. *See Sohappy v. Smith*, 302 F.Supp. at 908; *United States v. Oregon*, 769 F.2d at 1416; *United States v. Oregon*, 657 F.2d 1009, 1016–1017 (1981) (affirming a total ban on tribal harvest of spring chinook salmon); *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 176–177, 97 S.Ct. 2616, 2623, 53 L.Ed.2d 667 (1977) (affirming the right to regulate on-reservation fishing).

The instant action, however, does not involve either limitations on catch or exclusion from traditional hunting grounds. Rather, the Tribe seeks compensation for the destruction of the fish runs themselves. In other words, the Tribe argues that developments such as dams which damage, reduce or destroy the fish runs violate their 1855 Stevens treaty fishing rights and entitles them to an award of monetary damages.

### b) *Treaty Rights to Preservation of Fish Runs*

The ultimate issue presented is whether the treaty provides the Tribe with an absolute right to preservation of the fish runs in the condition existing in 1855, free from environmental damage caused by a changing and developing society. Only if such a right exists is the Tribe entitled to an award of monetary damages.

The parties have cited, and the Court's own independent research has disclosed only three cases which directly address this ultimate issue. *United States v. Washington* (hereinafter *"Washington 1982"*), 694 F.2d 1374 (9th Cir.1982); *Muckleshoot Tribe v. Puget Sound Power and Light*, CV No. 472–72C2V (W.D.Wash.1986); and *Nisqually Tribe v. City of Centralia*, No. C75–31 (W.D.Wash.1981). However, *Washington 1982* was vacated by the Ninth Circuit on

other grounds in a subsequent en banc decision. *United States v. Washington,* 759 F.2d 1353 (9th Cir.1985). *Muckleshoot Tribe v. Puget Sound* expressly relied on the *Washington 1982* opinion which was not vacated until after the decision in *Muckleshoot* was issued. Therefore, it appears that this Court is required to address and determine an issue of first impression without the benefit of any binding precedent available for guidance and direction. *See Los Angeles News Service v. Tullo,* 973 F.2d 791, 795 n. 4 (9th Cir.1992) which held that a vacated decision is not binding precedent.

However, it is noteworthy that the Ninth Circuit, in subsequently vacating its *Washington 1982* holding did not overrule its decision or reverse the analysis of the legal issues and its reasoning. *See United States v. Washington,* 759 F.2d 1353 (9th Cir.1985). In its 1985 *United States v. Washington* opinion, the Ninth Circuit vacated its 1982 decision on the environmental declaratory judgment issue. In its 1985 decision, the Ninth Circuit held:

> "That portion of the district court's judgment granting a declaratory judgment with regard to the hatchery fish issue is AFFIRMED. The declaratory relief granted with regard to the environmental issue is VACATED."

*Id.* at 1360 (capitalization in original).

After carefully and thoroughly analyzing the legal issues presented in the instant action, the Court has independently reached a conclusion on the treaty rights issue similar to that reached by the Ninth Circuit in its *Washington 1982* opinion. Although the Ninth Circuit's 1982 opinion was vacated on other grounds, the Court in the instant action has considered and analyzed the legal analysis and holding contained in that opinion and concludes that the rationale utilized therein is sound and well reasoned. Rather than paraphrasing the analysis of that opinion and its reasoning without candidly acknowledging that the Court considered that language in resolving these issues would be inappropriate. The Court is of the view that the rationale of the *Washington 1982* opinion is persuasive and thus has considered its legal

analysis and language in the same context as if it had been a law review article or other non-binding, but well reasoned legal authority. On occasion, the Ninth Circuit has relied on a reported opinion which has been subsequently vacated on other grounds. In *Ablers v. Whitley,* 743 F.2d 1372, 1375 (9th Cir.1984) the Ninth Circuit knowingly relied on the reasoning contained in an earlier decision which had been vacated to allow for an *en banc* rehearing.

In this regard, it is obvious that the Court is presented with a dilemma in resolving the instant action. If the Court considers the language or legal analysis contained in the vacated *Washington 1982* opinion, regardless of how well reasoned that decision or language may be, any decision rendered is subject to challenge or criticism on the grounds that it was based in part on language, reasoning or analysis from an opinion that had been vacated. On the other hand, to avoid considering sound legal reasoning and analysis which has not been reversed solely because it is set forth in an opinion that has been vacated on other grounds is not good jurisprudence and is likewise subject to criticism. There is no truly attractive alternative or solution to this dilemma other than to address the issues directly and utilize the best legal reasoning and analysis available. Therefore, the Court in resolving the instant issues, has considered the legal analysis and reasoning contained in the 1982 opinion. However, the Court would have reached the same legal conclusion and ultimate decision in this action even without considering the 1982 decision.

In the Court's view, Indian tribes do not have an absolute right to the preservation of the fish runs in their original 1855 condition, free from all environmental damage caused by the migration of increasing numbers of settlers and the resulting development of the land. A review of the language used in *Washington 1982* is instructive on this issue wherein the Ninth Circuit Court of Appeals considered whether the courts should imply a right to environmental protection of treaty reserved fish runs. In that action the court was concerned with whether there should be an implied state duty to refrain from degrad-

ing or authorizing the degradation of the fish habitat to an extent that would deprive the Indians of their moderate living needs. In reaching its conclusion that the Stevens treaties do not create an absolute ban on development which endangers or injures the fish runs, the Ninth Circuit examined the rights created by the Supreme Court's holding in *Fishing Vessel*. The analysis and reasoning of the Ninth Circuit is helpful and the following language from the *Washington 1982* decision is instructive.

> The Supreme Court in *Fishing Vessel* held that Indian treaty rights exceeded those envisioned by the equal opportunity theory. Beyond its holding that the Indians are entitled to a share of the fish, the Court did not indicate in what manner or under what circumstances this share was entitled to protection. It certainly did not adopt a comprehensive environmental servitude.

*Washington 1982*, 694 F.2d at 1381.

> The specter the district court raises of tribal fishermen unprotected by the environmental right dipping their nets into the water and bringing them out empty [citation omitted] cannot alter the scope of *Fishing Vessel*. Only the extension of the servitude to ban even non-discriminatory development occurring both within and without treaty fishing areas could assure against any decline in the amount of fish taken. The treaty does not grant such assurance. In its absence, losses arising from reasonable development should be borne fifty/fifty by treaty and non-treaty fishermen. This is what the Supreme Court necessarily intended by holding that the Indians are entitled to a *share* of the *available* fish, 443 U.S. at 685–87 & n. 27, 99 S.Ct. at 3074–75, [citation omitted] rather than to a fixed quantity of fish.
>
> A pattern of development which concentrated the adverse effects of growth on treaty fish runs, and spared non-treaty runs, of course, would violate the treaty right. No special environmental right based on moderate living needs or some historic catch level need be created to remedy such a violation, however. State regu-

lation cannot discriminate against the Indian fishery. *Puyallup II*, 414 U.S. [44] at 48, 94 S.Ct. [330] at 333 [38 L.Ed.2d 254 [(1973)]. This principle is broad enough to encompass discriminatory granting of permits for projects with potentially adverse environmental effects.

*Id.* at 1382.

In addition, the Ninth Circuit rejected the trial court's conclusion that other previous cases implied a general right to environmental protection of the fish:

> Like the district court, we interpret the treaty to apply to the building of dams, factories, and highways provided they are State-authorized. But unlike the district court, we acknowledge the danger of overreaching what the treaty fairly requires, by framing the obligation to compensate for adverse environmental impact in terms of reasonableness. *See supra*, pp. 1380–1381.

*Id.* at 1382–83, n. 17.

Thus, according to the Ninth Circuit's persuasive reasoning in *Washington 1982*, the states may allow or even authorize development which reduces the number of fish in the annual runs as long as such action does not discriminate against treaty fishermen in determining what development will be authorized. Although the opinion was vacated on other grounds, the Court agrees with the legal analysis in *Washington 1982*. In the Court's view, the Stevens treaties do not protect the Indians from degradation of the fish runs caused by development which is not part of a pattern of discrimination against Indian treaty fish runs.

The court in *Washington 1982* did not hold that the states have no obligations with regard to the degradation of the fish runs. Rather, it concluded that the "... States and the Tribes must each take reasonable steps commensurate with the resources and abilities of each to preserve and enhance the fishery when their projects threaten then-existing harvest levels." *Id.* at 1389.

> The "reasonable steps" duty we find implied by the terms of the treaty focuses on whether the State's (or the Indians') compensatory steps to protect and enhance the fishery—whether made necessary by non-

fishing or fishing activities—are reasonable.

*Id.* at 1389.

In *Washington 1982,* the Ninth Circuit did not, however, suggest or imply, except in exceptional circumstances which are not present here, that monetary damages was the appropriate remedy in the event either party failed to take such reasonable steps. Further, the damages discussed therein were contemplated to be against a state or against an Indian tribe or band, but not against a private individual or licensee. When discussing "compensation," the Ninth Circuit spoke in terms of "protection" and "enhancement," not monetary damages. *Id.* at 1389.

All of the cases and legal authorities cited to the Court, and all of the cases this Court has independently examined, have required mitigation or protection efforts rather than providing for an award of damages. Accordingly, this Court concludes, as discussed at length in the following section, that an award of monetary damages to the Tribe for a reduction of the number of fish in the chinook runs is not an appropriate legal remedy because Plaintiff does not have a property ownership interest in the fish runs.

*Fishing Vessel* is the only binding opinion which even appears to suggest that the Stevens treaties gave the Indian tribes an absolute right to the preservation of the fish runs in the condition existing in 1855, free from environmental damage caused by a changing and developing society. However, after a careful consideration of the issues presented here, the Court is of the view that the United States Supreme Court in *Fishing Vessel* did not hold or intend that the 1855 treaty would create a situation where future development would be prohibited even if it caused damage to the fish runs or the environment. In *Fishing Vessel,* the Supreme Court held that the Indians have more than an equal opportunity to fish, held in common with the citizens of the several states and it held that the tribes may be entitled to as much as fifty percent (50%) of the available fish. This Court is not able to accept Plaintiff's argument that a right to a certain percentage of the available fish can be construed to include a guarantee that a certain number of fish will be available. Therefore, this Court concludes that *Fishing Vessel* does not hold that the Stevens treaties protect the Plaintiff's treaty fishing rights from degradation of the fish runs caused by construction and operation of hydro-electric dams in the Columbia River system.

Those cases cited by the Tribe which establish a right to monetary compensation from the United States government for damage to property are clearly distinguishable because in those actions the injured party actually owned the damaged property. In the instant action, the Tribe does not own a property interest in the fish, but rather has only a treaty right entitling their members to take fish at the usual and accustomed places.

In the Court's view, the 1855 treaty does not provide a guarantee that there will be no decline in the amount of fish available to take. The only method that would guarantee such protection would be to prevent all types of development, whether or not it is discriminatory of Indian treaty rights. The Stevens treaties simply do not provide the Tribe with such assurance or protection.[22]

---

**22.** In the two Washington district court cases (*Muckleshoot Tribe v. Puget Sound* and *Nisqually Tribe v. City of Centralia* ) which rely on *Washington 1982,* 694 F.2d 1374, the Washington district court reached the same conclusion as this Court for a different reason:

> Any claim for monetary damages arising out of the treaties would be appropriate only as against the United States or one of its political subdivisions. In consequence, the motion of Puget to dismiss the monetary and punitive damages claims for alleged treaty violations must be granted.

*Muckleshoot Tribe v. Puget Sound Power & Light,* Case No. 472–72C2V, Order dated October 8, 1986 at pp. 3–5; *see also Nisqually Indian Tribe v. City of Centralia.*

This Court agrees with the Washington district court that the Indians may not obtain damages from private parties for treaty violations. However, if the Indians had a property interest in the fish, regardless of whether that interest was created by treaty, the Indians would have a recognized cause of action against any private party who intentionally or negligently injured the fish. Therefore, this Court bases its decision on the fact that the Indians do not have a property interest in the fish runs, rather than on the fact that Idaho Power is a private party.

#### c) *Award of Monetary Damages*

The Tribe contends that there is case law authority for the proposition that damages to property similar to the Tribe's property interest in the fish runs in the instant action is compensable by award of monetary damages. Although the Court has concluded in the preceding section that the Tribe is not entitled to the same number or quantity of fish in the modern fish runs that existed in 1855, it is necessary to discuss in this opinion, for purposes of subsequent review, whether the Tribe is nonetheless entitled to an award of monetary damages.

The Tribe contends that the Supreme Court's ruling in *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) requires that destruction of the fish and exclusion of the Tribe from its ancient fishing places must be compensated. The circumstances leading up to the filing of the *Menominee* action began with the passage of the Termination Act of 1954, 25 U.S.C. §§ 891–902, the purpose of which was to provide for "orderly termination of Federal supervision over the property of the Menominee Tribe" and several other Indian tribes. Pursuant to the Termination Act, the Menominee Tribe submitted a plan which contemplated the creation of a Wisconsin county out of the former reservation and of a Wisconsin cooperation to hold other property for the Tribe and its members. The Act provided that after the Secretary of the Interior transferred title to the Tribe's property, all federal supervision would end and "the laws of the several States [would] apply to the tribe and its members in the same manner as they apply to other citizens or persons within its jurisdiction." Wisconsin claimed therefore that it had the right to regulate tribal hunting and fishing in the same manner as it regulated the hunting and fishing of its non-tribal citizens. In response, the Menominee Tribe brought an action in the Court of Claims against the United States for just compensation of the hunting and fishing rights which they had reserved by implication in the Treaty of Wolf River, 1854. 10 Stat. 1064. The Court of Claims concluded that the Tribe held hunting and fishing rights pursuant to the Wolf River Treaty and, contrary to the Wisconsin Supreme Court's opinion, the Termination Act did not abrogate those rights. The United States Supreme Court held that 18 U.S.C. § 1162 granted the states jurisdiction over offenses committed by or against Indians in certain places, including the whole of Wisconsin, and stated: "Nothing in this section . . . shall deprive any Indian or any Indian tribe . . . of any right, privilege, or immunity afforded under Federal treaty . . . or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." The latter portion of the opinion suggests that if Congress had terminated the Menominees' hunting and fishing rights, the United States would be obligated to compensate the Tribe for its loss of treaty rights.

Assuming that in *Menominee* the United States Supreme Court did expressly hold that where the United States deprives an Indian tribe of hunting and fishing rights secured by treaty, that it must compensate the tribe for such loss, this Court is of the view that the *Menominee* decision is not applicable to the instant action. Here, the Tribe has not brought an action against the United States for depriving it of its historical or treaty fishing rights. Rather, the Nez Perce Tribe seeks an award of damages from Idaho Power, a private party licensee, for reduction to the spring and fall chinook salmon fish runs to which the Tribe has a treaty right to fish in common with the citizens of the United States. In the Court's view, the Tribe does not have a vested property interest in a certain fixed quantity of fish in the annual fish runs and concludes that the Tribe does not have a cause of action for an award of monetary damages against Idaho Power. The basis of the Court's conclusion is that the Tribe does not own the fish runs or the fish but rather, it owns a treaty right to take fish from its usual and customary places as specified in the 1855 treaty.[23] Neither the Nez Perce Tribe nor any of its enrolled members have a property interest in any particular number of fish in the runs unless

---

**23.** Likewise, the states do not own fish swimming within their waters. *Douglas v. Seacoast* *Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977).

fish are actually present in the river and can be caught. In this respect, the *Menominee* holding is clearly distinguishable.[24]

#### d) *Inundation of Usual and Accustomed Fishing Places*

Although not plead as part of its pleadings, at oral argument the Tribe argued that the backwaters of the Hell's Dam Complex have inundated the usual and accustomed fishing places which constitutes a "taking" for which there has been no compensation. *See* footnote 20. Obviously, many of the rocks, fishing spots or holes immediately adjacent to or located in the Snake River from which the Tribe's ancestors fished have been inundated by the Hell's Dam Complex backwaters. However, the inundation of specific fishing places, holes, rocks or spots does not change the issues presented here. In the Court's view, the focus must be kept on the damage asserted by the Tribe in its complaint, namely the environmentally damage induced reduction of the number of fish in the fish runs caused by the construction and operation of the Hell's Dam Complex. The issue before the Court is monetary damages and losses occurring as a result of destruction of the fish runs, and not for damages arising out of an action sounding in conversion of a particular rock, outcropping or waterfall that was a traditional fishing location. Conversion claims are not before the Court and will not be considered when raised for the first time at oral argument.

By way of summary of this entire section, the Court is of the opinion that the Tribe does not have a federal cause of action for monetary damages against Idaho Power for injuries to the fish runs caused by its actions and conduct in the construction, maintenance and operation of the Hell's Dam Complex.

#### 3. *State Common Law*

The Tribe has also asserted that it has an Idaho common law action for damage to the fish runs. However, after examining the cit-

ed authorities and cases at considerable length, this Court is unable to accept the Tribe's position that the Tribe has a state common law cause of action for compensation or monetary damages to the fish runs caused by a licensee constructing and maintaining a dam. Further, the Court's own independent research has not revealed any cases or authority supporting the Tribe's claim for a monetary award for damage or destruction to the fish runs under these circumstances. Nonetheless, the Court will address the various theories advanced by the Tribe in asserting a state common law tort action.

#### a) *Preemption by Federal Power Act*

■ It is necessary to consider Idaho Power's contention that any state cause of action the Tribe may have is preempted by the FPA. As discussed above in the analysis of subject matter jurisdiction, Congress has made it clear by the enactment of 16 U.S.C. 803(c) that it did not intend to preempt state common law property rights. However, Idaho Power contends that section 803(c) protects only the property rights of "private owners" and because the Tribe's treaty fishing rights are held by it as a sovereign nation, its treaty fishing rights are not protected by this statute because it is a sovereign nation. This Court disagrees with this narrow interpretation. Section 803 has been applied to the property rights of state agencies. *See Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958). Likewise, in *Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), the United States Supreme Court held that for purposes of protecting property interests, Indian tribes holding property interests in common for their members may act as private owners in bringing actions for property damages. In the Court's view, the Tribe's cause of action for property damage is clearly not preempted by the FPA.

---

**24.** The Tribe also cites and relies upon *Oppenheimer Industries, Inc. v. Johnson Cattle Co.,* 112 Idaho 423, 426, 732 P.2d 661, 664 (1986) and *Pueblo of Isleta ex rel. Lucero v. Universal Con-* *structors, Inc.,* 570 F.2d 300 (10th Cir.1978). As these cases discuss primarily state law, the Court will discuss these cases further.

#### b) *State Common Law Analysis*

With the exception of *Oppenheimer Industries, Inc. v. Johnson Cattle Co.,* 112 Idaho 423, 426, 732 P.2d 661, 664 (1986) and *Pueblo of Isleta ex rel. Lucero v. Universal Constructors, Inc.,* 570 F.2d 300, 302 (10th Cir.1978), the Tribe has not cited any legal authorities which establish a state common law cause of action in these circumstances. In the Court's view, both actions are clearly distinguishable. In *Oppenheimer,* the state court awarded plaintiff damages for the loss of its cattle. However, *Oppenheimer* is not applicable to the instant action because plaintiff actually owned the cattle for which it claimed damages. In the instant action, the Tribe does not own the fish for which it seeks damages, but only has the treaty right to catch or harvest the fish that are available. In the Court's view, this is not a property right as contemplated by section 803(c) or the established case common law.

In support of its claim for damages, the Tribe cites *Pueblo of Isleta ex rel. Lucero v. Universal Constructors, Inc.,* an action where the Indian tribe sought monetary compensation for injuries to reservation property caused by off-reservation blasting. Because the reservation land in question had never been allotted, the Isleta Tribe held title to the property in trust for its tribal members. In the Court's view, *Pueblo of Isleta* is likewise inapplicable to the instant action for the same reasons that *Oppenheimer* is inapplicable, i.e. the Tribe does not own the fish in the salmon run. Rather, the Tribe's property interest or ownership claim is its right to take fish at its usual and historical accustomed fishing grounds. This does not amount to a vested ownership or property interest in the fish or to a particular number of fish sufficient to give rise to an action as provided in *Pueblo of Isleta* and *Oppenheimer.*

Thus, it appears to the Court that the Tribe's treaty right allows it to take or catch fish in the usual and accustomed places, rather than a right to any particular number of fish. The Court therefore concludes that the Tribe does not have an action for monetary damages, conversion or tortious interference with a property right.

#### 4. *Affect of Changing Circumstances on Indian Treaty Rights*

A review of the case law concerning the effects of environmental change on the rights established under the Stevens and other Indian treaties provides some insight and explanation beyond the vested versus non-vested property rights contained in the preceding sections as to why the Tribe does not have a cause of action for damages.

Idaho Power has cited several cases in support of its contention that the Tribe's treaty fishing rights do not provide an absolute entitlement. In *Fishing Vessel,* for example, the United States Supreme Court makes it clear that the allocation of harvestable fish between treaty and non-treaty fishermen was and could be affected by the Tribe's changing circumstances.

> If, for example, a tribe should dwindle to just a few members, or if it should find other sources of support that lead it to abandon its fisheries, a 45% or 50% allocation of an entire run that passes through its customary fishing grounds would be manifestly inappropriate because the livelihood of the tribe under those circumstances could not reasonably require an allotment of a large number of fish.

*Fishing Vessel,* 443 U.S. 658 at 686–87, 99 S.Ct. at 3074–75.

An Indian tribe's treaty rights are also subject to changes outside the reservation brought about by circumstances beyond the control of either the tribe or its members. In *Blackfeet, etc. Nations or Tribes of Indians,* 81 Ct.Cl. 101, 1935 WL 2289 (1935), a group of Indian nations, including the Nez Perce Tribe, brought an action for damages against the United States for depletion of game frequenting the "common hunting ground." The Blackfeet argued that the United States was responsible for the settlement of the common hunting grounds which lead to the decline in harvestable big game animals. The Court of Claims held that the right to hunt the common grounds did not include "any terms guaranteeing to the Indi-

ans a maintenance of the status quo for almost a century." *Id.* at 121.

It is also well established that treaty rights to catch and harvest fish are also subject to changing outside circumstances. When a species is endangered, the states and the United States can regulate treaty fishing rights for the purpose of protecting the species. *Department of Game v. Puyallup Tribe*, 414 U.S. 44, 49, 94 S.Ct. 330, 334, 38 L.Ed.2d 254 (1973); *United States v. Oregon*, 769 F.2d at 1416; *Sohappy v. Smith*, 302 F.Supp. at 908; and *United States v. Oregon*, 657 F.2d 1009, 1016–1017 (9th Cir.1981).[25] The necessity for the "fair share" doctrine discussed above is also the result of changing circumstances due to the influx of settlers and the subsequent development of the land over the past 138 years.

Likewise, other treaty rights are also subject to changing circumstances. For example, when the character of a reservation changes, the tribe's right to govern the reservation may also change. In *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the United States Supreme Court held that the Crow Tribe had the right to regulate non-tribal member hunting and fishing within the reservation, but not on land owned in fee by non-tribal members. The Supreme Court reasoned that although the Crow Tribe had originally reserved such governmental powers, those powers were subject to changing circumstances. The Court noted "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." *Id.* at 561, 101 S.Ct. at 1256. Likewise, in *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) the United States Supreme Court held that although the Yakima Indian Nation has originally reserved the governmental power to exclude non-tribal members from its reservation, once non-tribal members purchased land and took up residence within the reservation, the Yakima Tribe's right to exclude non-members was accordingly limited.[26]

Having concluded that Indian treaties must be interpreted in light of new, and often changing, circumstances including conditions which limit the available quantity of fish, it is not surprising that the courts have not awarded monetary damages to Indian tribes for the depletion or destruction of fish and game caused by development.

This Court is not able to agree with the Tribe's contention that if Indian treaties are subject to changing circumstances, the treaties are therefore "an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." *See* Plaintiff's Response to Idaho Power's Motion for Summary Judgment, p. 39, quoting *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 397, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968). In the scope of this action, the Tribe's right to fish pursuant to the 1855 Stevens treaty only guarantees access to certain off-reservation fishing grounds and the right to attempt to catch available fish. The treaty does, however, require assurance that the Tribe will have a "fair share" of the available fish. The law requires the various states, and private parties in certain circumstances such as those presented here, to take remedial actions should their development of the rivers or the surrounding land injure the fish runs. The Stevens treaties require that any development authorized by the states which injures the fish runs be non-discriminatory in nature, *see Fishing Vessel*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 but does not, however, guarantee that subsequent development will not diminish or eventually, and unfortunately, destroy the fish runs.

---

**25.** *See also* "Application of the Endangered Species Act to Native Americans with Treaty Hunting and Fishing Rights," 87 Idaho L.Rev. 525 (1980).

**26.** The sale of land on both the Crow and the Yakima reservations resulted from the division of reservation land among tribal members pursuant to the Federal Allotment Act, 25 U.S.C. § 331, *et seq.* and the subsequent sale of land by tribal members to non-tribal members. The Supreme Court relied not only on the changing demographics within the reservation but also the purposes of the Federal Allotment Act in reaching its conclusion that tribal authority had been necessarily limited.

### 5. New Remedy for Damage to Fish Runs

Having concluded that the Tribe has no existing cause of action for depletion and damage to the fish runs, the Court will now consider whether it is appropriate to fashion a new federal common law action to protect the Tribe's historical off-reservation treaty fishing rights.

The Court initially notes that the creation of federal common law is disfavored and the development of legal rules of decision is properly reserved for the "people [acting] through their elected representatives in Congress." *Milwaukee v. Illinois*, 451 U.S. 304, 313, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981). In the Court's view, federal courts, because they are "purposely insulated from democratic pressures," are not suited for the development of legal rules of policy decision. Therefore, preemption of federal common law by legislative action, rather than judicial activism, is the preferred result.[27]

In *Conner v. Aerovox, Inc.*, 730 F.2d 835, 841 (1st Cir.1984), *cert. denied*, 470 U.S. 1050, 105 S.Ct. 1747, 84 L.Ed.2d 812 (1985) it was held that "once Congress has addressed a national concern, our fundamental commitment to the separation of powers precludes the courts from scrutinizing the sufficiency of the congressional solution.... 'The question is whether the field has been occupied, not whether it has been occupied in a particular manner'." (foonote and citations omitted) In determining whether the Federal Water Pollution Control Act, "the Clean Water Act," 33 U.S.C. § 1251 *et seq.*, displaced federal common law regarding a nuisance action to abate water pollution, the United States Supreme Court examined the Act and its legislative history and determined that Congress had intended to restructure the law of interstate pollution. In making its determination, the Supreme Court considered the scope of the Act and held it provided the aggrieved parties with a remedy. *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114.[28]

Idaho Power contends that because the FPA is similarly broad in scope as the Clean Water Act, and offers aggrieved parties an administrative remedy, the FPA preempts any federal common law remedy the Tribe might have and that this Court should not fashion the Tribe with any new cause of action or remedies.

The courts have frequently commented on the breadth and scope of the FPA:

[The FPA] was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive negative approach of the River and Harbor Acts and other federal laws previously enacted....

... [I]t was the intention of Congress to secure a comprehensive development of national resources and not merely to prevent obstructions to navigation is apparent from the provisions of the Act....

The detailed provisions of the Act providing for the federal plan of regulation leave no room or need for conflicting state controls.

*First Iowa Hydro–Electric Cooperative v. Federal Power Com.*, 328 U.S. at 180–181, 66 S.Ct. at 919 (1946). *See also California v.*

---

27. State common law, as opposed to federal common law, should not be preempted by Congressional legislation, unless preemption is the clear and manifest purpose of Congress. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

28. Idaho Power has cited the Court to several other comprehensive Acts which it asserts displaced federal common law: (1) The Clean Water Act displaced federal common law nuisance actions regarding water pollution, *see Milwaukee v. Illinois*, 451 U.S. 304 at 317–319, 101 S.Ct. 1784 at 1792–93; (2) The Alaskan Native Claims Settlement Act preempts the federal common law remedy for invasion of a possessory interest in land, *see Lee v. United States*, 629 F.Supp. 721, 728–729 (D.Alaska 1985) *affirmed*, 809 F.2d 1406 (9th Cir.1987); (3) The Clean Air Act preempts federal common law of nuisance, *see United States v. Kin–Buc, Inc.*, 532 F.Supp. 699 (D.N.J. 1982); RCRA and CERCLA preempt the federal common law of nuisance, *see United States v. Price*, 523 F.Supp. 1055, 1069 (D.N.J.1981), *affirmed*, 688 F.2d 204 (7th Cir.1982).

*FERC,* 495 U.S. 490, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990) (reaffirming *First Iowa* ); *Federal Power Com. v. Union Electric Co.,* 381 U.S. 90, 107, 85 S.Ct. 1253, 1263, 14 L.Ed.2d 239 (1965); *Scenic Hudson Preservation Conference v. Federal Power Com.,* 354 F.2d 608, 613 (2d Cir.1965), *cert. denied sub nom., Consolidated Edison Co. v. Scenic Hudson Preservation Conference,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

The FPA also provides an administrative forum for those persons who question FERC decisions or who are injured by noncompliance of a licensee. 16 U.S.C. §§ 825e, 825f, 825g, 825h, and 825*l.* However, it is clear that the FPA does not give FERC the power to award damages to aggrieved parties and limits its power and jurisdiction to enforce its rules, regulations and license requirements.

The FPA provides "[FERC] shall solicit recommendations from the agencies and Indian tribes ... for proposed terms and conditions for the Commission's consideration for inclusion in the license." 16 U.S.C.A. § 803(a)(3).[29] However, it is clear that Congress did not intend to give the Indians unlimited rights or veto power over hydroelectric projects. In *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), the Supreme Court noted:

It is equally clear that, when enacting the FPA, Congress did not intend to give Indians some sort of special authority to prevent the Commission from exercising the licensing authority it was receiving from Congress. Indeed, Congress squarely considered and rejected such a proposal. During the course of the debate concerning the legislation, the Senate amended the bill to require tribal consent for some pro-

jects. Section 4(e) of the Senate version of the bill provided that "in respect to tribal lands embraced within Indian reservations, which said lands were ceded to Indians by the United States by treaty, no license shall be issued except by and with the consent of the council of the tribe." 59 Cong.Rec. 1534 (1920). However, that amendment was stricken from the bill by the Conference, the conferees stating that they "saw no reason why waterpower use should be singled out from all other uses of Indian reservation land for special action of the council of the tribe." H.R.Conf.Rep. No. 910, 66th Cong., 2d Sess., 8 (1920).

. . . .

[Tribes do not have] the power to override Congress' subsequent decision that all lands, including tribal lands, could, upon compliance with the provisions of the FPA, be utilized to facilitate licensed hydroelectric projects. Under the FPA, the Secretary [of the Interior], with the duty to safeguard reservations, may condition, but may not veto, the issuance of a license for project works on an Indian reservation. We cannot believe that Congress nevertheless intended to leave a veto power with the concerned tribe or tribes.

*Id.* 466 U.S. at 787, 104 S.Ct. at 2117–18.

Thus, it is clear to this Court that Congress, when passing the FPA, considered the legislation's affect and impact on Indian treaty rights. It is also clear that when enacting the FPA, Congress provided for the impact of hydro-electric projects on fish runs, by requiring FERC to consider the recommendations of various agencies and of the adversely affected tribes. *See* 16 U.S.C. § 803(j)(1)–(2).[30] Further, the remedies

---

**29.** *See also Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765 at 774–775, 104 S.Ct. 2105 at 2111–12 which requires FERC to insert the conditions the Secretary of the Interior deems necessary for projects within Indian reservations; *Covelo Indian Community v. Federal Energy Regulatory Com.,* 895 F.2d 581, 586 (9th Cir.1990) which recognized that FERC has the same fiduciary responsibilities to the Indians as the United States; *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Federal Power Com.,* 510 F.2d 198, 212 (D.C.Cir.1975) which states Indian treaty rights must be as-

sessed as a precondition to issuance of any long-term license affecting the band's tribal lands.

**30.** The courts have enforced FERC's responsibilities with regard to protection of fish. *See Confederated Tribes and Bands of the Yakima Indian Nation v. Federal Energy Regulatory Com.,* 746 F.2d 466, 470–474 (9th Cir.1984), *cert. denied, sub nom., Public Utility Dist. No. 1 v. Confederated Tribes and Bands of Yakima Indian Nation,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985); *Scenic Hudson Preservation Conference v. Federal Power Com.,* 354 F.2d 608 at 620; *Wash-*

which FERC may impose, i.e. mitigation of damage to the fish runs, appear to support the various court decisions imposing a duty of mitigation rather than awarding damages as the remedy to protect the Indian's treaty fishing rights.

It is the considered opinion of this Court relating to damage to the fish runs that enactment of the FPA by Congress preempts any federal common law damage remedy this Court might fashion for the Tribe. Therefore, this Court declines to create a new federal cause of action for the Tribe.

## IV.

### SUMMARY JUDGMENT STANDARD GENERALLY

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the non-moving party fails to make such a showing on

any essential element of his case, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2553.[31]

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial," *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (*quoting First Nat'l Bank v. Cities Serv. Co., Inc.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) or when the "evidence is such that a reasonable jury could return a verdict for the non-moving party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). The Ninth Circuit cases are in accord. *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund,* 882 F.2d 371 (9th Cir.1989).

In ruling on summary judgment motions, the court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.,* 809 F.2d 626 (9th Cir.1987). Moreover, all inferences must be drawn in the light most favorable to the non-moving party. *Id.* at 631. As the Ninth Circuit Court of Appeals has stated, "put another way, if a rational trier of fact might

---

*ington Dept. of Game v. Federal Power Com.,* 207 F.2d 391, 395 n. 11 & 398 n. 20 (9th Cir.1953), *cert. denied,* 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087 (1954).

For a general discussion of the causes of the salmon's decline and the efforts to reverse that decline *see Saving Idaho's Salmon: A History of Failure and a Dubious Future,* Michael Blumm, 28 Idaho L.Rev. 667 (1991–1992); and *Breathing Life Back Into a Drowned Resource: Mitigating Wildlife Losses in the Columbia Basin Under the Northwest Power Act,* Stephen Brown, 18 Entl.L. 571 (Spring 1988).

**31.** *See also* Rule 56(e), which provides in part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

U.S.C.S. Court Rules, Rules of Civil Procedure, Rule 56(e) (Law.Co-op.1987 & Supp.1991).

resolve the issue in favor of the non-moving party, summary judgment must be denied." *Id.*

In order to withstand a motion for summary judgment, the Ninth Circuit has held that a non-moving party

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. (citation omitted)

*British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund,* 882 F.2d 371, 374 (9th Cir.1989). Moreover, the Ninth Circuit has held that where the moving party meets its initial burden of demonstrating the absence of any genuine issue of material fact, the non-moving party must "produce specific facts showing that there remains a genuine factual issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983) (citing *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)).

The Ninth Circuit Court of Appeals has acknowledged that in recent years the Supreme Court, "by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). As the Ninth Circuit has expressly stated: "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

Indeed, in addressing the application of "The Summary Judgment Test," the Ninth Circuit has specifically explained that:

A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the *substantive law* governing the claim or defense. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

*T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Asso.,* 809 F.2d 626, 630 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)) (emphasis added).

Although in the instant action the Tribe has produced clear and essentially undisputed evidence of damage to the fish runs as a result of the Hell's Dam Complex which would have been sufficient to create issues of fact regarding the damage issue, this Court concludes that the issue presented here is a question of law as to whether the Tribe has a cause of action for an award of monetary damages. Assuming that all of the facts relating to the loss of the fish runs were true and undisputed, which the Court accepts for summary judgment purposes, the Tribe still does not have a cause of action for monetary damages because the Stevens treaty only provided the right of "taking fish" and did not provide any specific right that the number of fish would remain the same or that environmental circumstances would not change with the passage of time and the development of the region. Therefore, in the Court's view, there are no genuine issues of material fact and Idaho Power is entitled to judgment as a matter of law.

### V.

### CONCLUSION

The United States District Court has subject matter jurisdiction to hear all of the matters at issue herein, including the Tribe's state common law claims. *See* 28 U.S.C. § 1362. In addition, the 1980 Order does not bar the Tribe from bringing the present action because FERC does not have jurisdiction to award monetary damages.

In the Court's view, there is no legal basis to establish a cause of action for monetary

damages for reduction in the Salmon fish runs caused by Idaho Power's construction and operation of the Hell's Dam Complex. Creation of federal common law is generally disfavored and several federal acts address the Tribe's concerns about mitigation efforts and protection of the fish. Therefore, it is the conclusion of the Court that it should not fashion a new cause of action.

In analyzing the significant issues presented herein, the Court has applied the rules of law which require that treaty disputes and ambiguities be resolved in favor of the Tribes, and also that treaties be construed as originally understood by the tribal representatives. In the Court's view, the language of the 1855 Stevens treaty is not ambiguous and clearly gives the Tribe a right to catch fish at the usual and accustomed places. However, the treaty does not guarantee or assure the Nez Perce that the salmon runs would always be present in the quantities existing in 1855 in light of the changing circumstances and needs of society to develop the water resources of the Snake River. Further, the Tribe does not own the fish in the runs, but only has the treaty right to catch available fish. Accordingly, no monetary damages can be awarded to the Tribe for reduction in the number of fish in the annual steelhead and salmon runs on the Snake River as a result of the Hell's Dam Complex constructed and operated by Idaho Power.

Therefore, the Court recommends that Defendant's Motion for Summary Judgment be GRANTED.

## VI.

### RECOMMENDATION

The Court, being fully advised, recommends for the foregoing reasons that Defendant's Motion for Summary Judgment (Docket No. 31) be GRANTED.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(d) or as a result that party may waive the right to raise factual and/or legal objections in the Ninth Circuit Court of Appeals.

DATED this 30th day of July, 1993.